## McBATH et al. v. JONES COTTON CO.

(Circuit Court of Appeals, Sixth Circuit. December 14, 1906.)

### No. 1,559.

1. SALES—CONTRACT—TIME FOR DELIVERY—ANTICIPATORY BREACH.

Plaintiff contracted to deliver 1,000 bales of cotton, of specified grades and at specified prices, on or before October 15, 1905, to a carrier, according to shipping directions to be furnished by defendants; plaintiff to pay cost and freight to Liverpool. About October 3d the point of delivery was changed; plaintiff agreeing to deliver at its warehouses in Birmingham and Decatur, Ala. On October 4th defendants sent an agent to Birmingham to receive cotton to be tendered there, and he, after accepting 100 bales, refused to examine or accept more, because the cotton tendered was not equal in staple to the contract quality. The agent was requested to go to Decatur and examine cotton to be tendered there, but refused, and on October 7th defendants, claiming a violation of the contract, gave notice of cancellation and thereafter refused to accept any further tenders. *Held*, that plaintiff had until October 15th in which to tender cotton complying with the contract, and that defendants' refusal to inspect and accept was premature, and entitled plaintiff to recover damage as for a breach of contract.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Sales, §§ 222, 223, 362.]

2. SAME.

The rules applicable to an anticipatory breach of a contract apply as well to one party as to the other. The general rule applicable to a contract for sale and future delivery of articles not specifically designated is that a

buyer cannot reject a delivery conformable to the contract, when made in time, merely because there had been a prior tender of goods not conformable and rejected on that ground.

3. CORPORATIONS—FOREIGN CORPORATIONS—DOING BUSINESS WITHIN STATE.

Plaintiff, an Alabama corporation, with no warehouse, office, or domicile in Tennessee, contracted through a broker in Tennessee to sell cotton to defendants, to be delivered to a carrier in Alabama for foreign transportation and delivery. *Held*, that such transaction constituted interstate, and not local, commerce, and that plaintiff was not, therefore, doing business in Tennessee, within a statute of that state regulating foreign corporations.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 12, Corporations, §§ 2520–2527.

Foreign corporations "doing business" in state, see Wagner v. J. & G. Meakin, 33 C. C. A. 585; Ammons v. Brunswick-Blake-Collender Co., 72 C. C. A. 622.]

In Error to the Circuit Court of the United States for the Western District of Tennessee.

W. A. Percy, for plaintiffs in error.

Thos. M. Scruggs, for defendant in error.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

LURTON, Circuit Judge. The plaintiffs on September 29, 1905, contracted to sell to the defendants 1,000 bales of cotton, deliverable on or before October 15th to a carrier according to shipping directions to be furnished by the buyer; seller to pay cost and freight to Liverpool. The cotton was sold by samples of type and was described as follows: 200 bales fully good middling at 11⅛ cents per pound; 500 bales good middling at 11 cents per pound; 300 fully middling at 10⅞ cents per pound, "mutual allowance in weight"—a term signifying a reweighing at Liverpool, seller to be credited with gains over weights when delivered to carrier and charged with loss. Shipping instructions were sent October 3d. But about the same date the buyers requested a delivery of the cotton to a representative here. After some objection the seller agreed to deliver what they could at their warehouse in Birmingham, Ala., and the rest at Decatur, Ala. On October 4th the buyers sent an agent to Birmingham to receive cotton there to be tendered. The agent brought with him samples, and claimed that the cotton to be received must correspond in staple. He proceeded very leisurely and with much circumspection. The first day, out of a much larger number of bales, he accepted less than 100 and declined the rest sampled for him. The next day he selected less than 50 bales, and upon the third day still less. In all, he accepted and marked something more than 100 bales. Most all of the cotton tendered upon these three days, and rejected, was refused upon the contention that it did not come up in staple to the cotton agreed to be delivered.

Cotton began to decline a day or two after this sale was made, and it continued to decline day by day. After the buyers' agent had spent parts of three days in inspecting cotton tendered upon the contract at Birmingham, he refused to inspect more and declared he would receive none; that the seller breached the contract by tendering cotton which was not deliverable in respect to staple; and that his principal

canceled the contract. He was urged to go on with the inspection, and asked to go to Decatur, where the seller had other cotton which would be tendered. This he absolutely declined to do and declared the contract off. This was on October 6th. The same night the buyers, upon information from this agent, wired the sellers as follows:

"Jones Cotton Co., Decatur, Ala:

"Your conduct as to my contract for one thousand bales is unjust, as you well know, and is a violation of the contract. I therefore cancel same.

"W. P. McBath & Co."

This wire was received on the morning of October 7th. On October 10th, Mr. Phillips, acting for the sellers, went to office of the buyers and told Mr. McBath that he had come for the purpose of tendering him the cotton. Mr. McBath said "there was no use in talking about it, that he was not going to take up the cotton." Mr. McBath substantially agrees by saying that he told Phillips that the agent he had sent to Birmingham was an experienced man; "that Phillips said, 'Will you go, and I will let you receive the cotton,' and I said that, if he did not agree with Mr. Whitman, he could not agree with me, and I told him I did not have the time to go down there and have another squabble with him, and I refused to go with him on those grounds. I was just as anxious to receive the cotton as he was to tender it." The decline in cotton by October 6th was $3.40 per bale; the market price in Liverpool, New York, Memphis, and Birmingham being substantially the same, with allowances for freight.

On October 20th this suit was started by the seller to recover damages for the breach. There was much evidence upon the question as to whether the sale was of any particular staple and whether the staple of the cotton tendered at Birmingham and rejected was in this respect conformable to the contract of sale. But Judge McCall, who heard the case in the court below, thought this was an immaterial question, and instructed the jury that it made no difference whether the cotton tendered upon October 6th was deliverable under the contract or not, or whether any cotton was then tendered; that the plaintiff had until October 15th to tender and deliver under the contract; and that the cancellation of the contract by the buyer on the 6th of October was unauthorized, and gave the plaintiff the right to recover damages. Accordingly the jury was directed to find for the plaintiff the difference between the contract price and the market price on October 6th. There was a judgment for $3,400.

Assuming that much of the cotton tendered at Birmingham and rejected was not receivable under the contract, the agent of the plaintiff in error did receive and mark more than 100 bales of that sampled for him. He was urged to continue his inspection—urged to go to Decatur, where part of the cotton was deliverable under the modified agreement. He arbitrarily refused to go on, canceled the contract, and went home. This action his principal ratified in express terms, and when, on the 10th, the buyers were urged to inspect other and further tenders, they stood flat upon the cancellation made on October 6th. The contract was not one for the sale of any specific bales of cotton. It could be performed by delivering any 1,000 bales which conformed to

149 F.—25

the trade description of the cotton sold. That a delivery might have been made on or before October 15th is not disputed. That the buyers on October 6th absolutely and unconditionally canceled the contract, and, when urged to inspect further tenders, claimed the right to repudiate their obligation, is also conceded. This is defended only upon the ground that the tender made upon the 6th was of cotton which was not deliverable in performance. But, if this was so, did that cut the vender off from making other deliveries at any time, on or before October 15th, of cotton which was receivable? A seller of chattels, who binds himself to deliver within a definite time, cannot excuse himself for not tendering a delivery when due, unless the buyer, in anticipation, makes the clearest announcement of his repudiation of the agreement and refusal to go on. The refusal must be absolute and unequivocal. Smoot's Case, 15 Wall. 37, 21 L. Ed. 107; Dingley v. Oler, 117 U. S. 490, 502–503, 6 Sup. Ct. 850, 29 L. Ed. 984. When the claim is that one party is relieved from performance by the conduct of the other before the time of performance, we must look to all the circumstances to see whether that conduct amounts to an out and out repudiation of the contract and an unequivocal refusal to perform his part. Michigan Yacht & Power Co., v. Busch (C. C. A.) 143 Fed. 939, 932; Cherry Valley Iron Works v. Florence Iron River Co., 64 Fed. 569, 572, 12 C. C. A. 306; Monarch Cycle Mfg. Co. v. Royer Wheel Co., 105 Fed. 324, 44 C. C. A. 523; Roehm v. Horst, 178 U. S. 1, 20 Sup. Ct. 780, 44 L. Ed. 953. The rules applicable to an anticipatory breach apply as well to one party as to the other. It may be that a tender of chattels not receivable may be made in such final and unequivocal terms as to justify the other party in acting upon it as a breach and canceling the agreement. But the general rule is that a buyer may not reject a delivery of goods conformable to the contract, when made in time, merely because there had been a prior offer of goods not receivable and rejected upon that ground. Tetley v. Shand, 25 Law Times, 658, and Borrowman v. Free, 41 L. R. Q. B. D. 500, are expressly in point.

In Borrowman v. Free, cited above, the facts were that the defendants agreed to buy of the plaintiffs a cargo of maize. The plaintiffs tendered the cargo of the C., which the defendants refused to accept. The plaintiffs insisted that the tender was valid. The dispute was referred to an arbitrator, who decided that the tender was invalid. The plaintiffs then, within the time limited by the contract, tendered the cargo of the M. This the defendants refused, upon the ground that they were not bound to accept any cargo in substitution for that of the C. The court held that the defendants were bound to accept the cargo of the M., and that the plaintiffs were entitled to recover damages as for a breach. In Tetley v. Shand, cited above, the plaintiffs tendered, before the expiration of the time for delivery, cotton which was not up to the contract. On defendants rejecting same, they, before expiration of the time fixed for delivery, tendered other cotton which was in accordance with the agreement. Held, that the plaintiffs had not, by the first delivery, broken the contract, so as to justify the defendants in refusing to accept the cotton subsequently tendered.

To justify a cancellation of a contract for purchase of so many bales of cotton of a certain type or quality before the time for delivery by the seller has passed, upon the ground of a tender of cotton not receivable, the purpose of the seller to make no other tender and to stand irrevocably upon the tender of delivery made must be absolute and unmistakable. There must be no locus penitentiæ. Here there was no standing by the sufficiency of the tender made of bales which had been rejected. The buyers' agent was urged to go on and examine other cotton, and to go to Decatur where cotton was deliverable under the modified agreement. Still later the seller showed his purpose not to abide by the actual tender made, and that he wished to show other cotton. The cancellation by the buyer was premature, and the plaintiff below had a right to maintain its suit for the difference between the contract price and the value on October 6th, at which date the defendants below elected to absolutely repudiate the contract. It may be that upon the 10th, when defendants reaffirmed their repudiation made upon the 6th, or upon the 15th of the month, the final day for delivery, there had been some change in market prices, or some gain or loss over the price upon the 6th of October. But the plaintiff had a right to accept the repudiation of the contract made upon the 6th in most unequivocal terms, and the defendants cannot complain if the damage is estimated as of that date. Roehm v. Horst, 178 U. S. 1, 21, 20 Sup. Ct. 780, 44 L. Ed. 953.

It is next said that the plaintiff below, the Jones Cotton Company, was an Alabama corporation, which had not complied with the Tennessee statute prescribing the terms upon which foreign corporations may do business within the state, and that the contract for the breach of which it sues is an invalid contract, because made by a corporation not authorized to do business in Tennessee. Cary-Lombard Lumber Company v. Thomas, 92 Tenn. 587, 22 S. W. 743; Harris v. Water & Light Company, 108 Tenn. 245, 67 S. W. 811. The Jones Cotton Company had no warehouse or office in Memphis. They had no cotton there. Their warehouse and office were in Alabama, and the cotton contracted to be sold was to be delivered to a carrier in Alabama for delivery in Liverpool or Havre. The sale was through a broker upon a commission, who sold for all who sought his services. It had not domiciled itself in Tennessee, and was not doing business in that state, within the meaning of the statute. The commerce, moreover, was interstate, and not local, commerce. The Tennessee court has limited the Cary-Lombard Case in Milan Milling Company v. Gorten, 93 Tenn. 590, 27 S. W. 971, 26 L. R. A. 135, in which case the court said:

"The court, in the Cary-Lombard Case, was not dealing with interestate commerce. No such question was presented by the record in that case. On the contrary, it distinctly appeared in evidence that the Cary-Lombard Lumber Company had an office and lumber yards in the city of Memphis, and was actually engaged in carrying on business in this state. It had acquired a situs and domicile in the state, and was, of course, subject to the regulations of our statute. In the case at bar, the Maish & Gordon Manufacturing Company, a foreign corporation, had simply contracted with citizens of Tennessee to furnish certain milling machinery and to adjust it in position in the mill. This company was in no sense engaged in carrying on its business in this state, but was engaged in an act of interstate commerce."

The other errors assigned are without merit. Judgment affirmed.