WEBER et al. v. GRAND LODGE OF KENTUCKY, F. & A. M.

(Circuit Court of Appeals, Sixth Circuit. May 13, 1909.)

No. 1,901.

1. LANDLORD AND TENANT (§ 288*)—FORCIBLE DETAINER—ISSUES.

The only issue involved in a landlord's forcible detainer suit is whether the relation of landlord and tenant existed and whether the tenant's term had expired.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. § 1205; Dec. Dig. § 288.*]

2. LANDLORD AND TENANT (§ 291*)—FORCIBLE DETAINER—JUDGMENT.

Under Civ. Code Prac. Ky. § 460, providing for a landlord's action of forcible detainer, the judgment, if for plaintiff, is only for restitution and costs.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. § 1253; Dec. Dig. § 291.*]

3. JUDGMENT (§ 554*)—CONCLUSIVENESS—FORCIBLE DETAINER.

Under Civ. Code Prac. Ky. § 460, defining forcible entry and detainer, and providing a remedy, no question of title being involved, the judgment is not a bar to ejectment to recover the property by either party.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. § 1058; Dec. Dig. § 554.*]

4. LANDLORD AND TENANT (§ 291*)—FORCIBLE DETAINER—STATUTES.

Civ. Code Prac. Ky. § 460, defining forcible entry and detainer, and providing a remedy, does not apply where actual notice cannot be given the defendant.

[Ed. Note.—For other cases, see Landlord and Tenant, Dec. Dig. § 291.*]

5. LANDLORD AND TENANT (§ 289*)—REPEAL BY IMPLICATION—FORCIBLE DETAINER—SERVICE.

Ky. St. 1903, § 2294, providing for substituted service in forcible detainer, when the defendant cannot be found on the premises, and there is no member of defendant's family thereon over 16 years of age with whom notice can be left by posting, etc., was not repealed by implication by Act March 29, 1902, p. 272, c. 122, regulating proceedings in civil actions in circuit courts, and repealing all provisions of the Code of Practice in conflict with the act, on the theory that such act re-enacted Civ. Code Prac. Ky. § 455, declaring that the officer having a warrant in forcible detainer shall give notice to the defendant according to the directions in the warrant.

[Ed. Note.—For other cases, see Landlord and Tenant, Dec. Dig. § 289.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

6. CONSTITUTIONAL LAW (§ 309*)—DUE PROCESS OF LAW—FORCIBLE DETAINER
—SUBSTITUTED SERVICE.

Ky. St. 1903, § 2294, authorizing substituted service of notice in forcible detainer, does not violate Const. U. S. Amend. 14, on the theory that such notice is not due process of law as applied to defendants, who are not citizens of the state, in so far as the court by means of such service is given jurisdiction to determine the right to possession of property within the state.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 929, 930; Dec. Dig. §·309.*]

7. LANDLORD AND TENANT (§ 86*)—LEASE—RENEWAL—TERMINATION OF TENANCY.

Defendants held a lease giving them an option to renew for five years, provided they agreed and covenanted to pay the highest rent which could be secured by or should be offered to the lessor by any responsible party. The lease expired on August 23, 1908, and on October 21, 1907, the lessees gave notice of their intention to exercise the option in conformity with the lease. On May 5, 1908, the lessees were shown a bona fide offer by a responsible prospective lessee to pay a higher rent, which the lessees refused to meet. *Held* that, though the lessees had until August 23d to meet such offer, the lessor was entitled to treat their refusal to do so on May 5th as a definite refusal to avail themselves of the option and to regard the same as abandoned.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. § 271; Dec. Dig. § 86.*]

8. LANDLORD AND TENANT (§ 86*)—RENEWAL OF LEASE—OPTION—ABANDONMENT.

The lessees not having covenanted and agreed before August 23, 1908, to meet such offer, they could not take any advantage of the lessors' immediate renting of the property and refusing to reopen negotiations after the lessees' definite refusal on May 5th.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. § 271; Dec. Dig. § 86.*]

In Error to the Circuit Court of the United States for the Western District of Kentucky.

This was an action of unlawful detainer started before a Kentucky justice of the peace and removed, upon diversity of citizenship, into the court below. The defendants in the suit were citizens of Illinois, the plaintiffs a corporation under the laws of the state of Kentucky. The writ was sued out to recover possession of a property known as the "Masonic Theatre," and its appurtenances, fixtures, etc., situated in Louisville, Ky., and owned by the Grand Lodge. The theatre was leased on August 23, 1903, to the plaintiffs in error, Max and David B. Weber, brothers and partners under the style of Weber Bros., for a term of five years. Upon the expiration of the lease, the tenants refusing to surrender the premises, a writ of forcible detainer was sued out on August 24, 1908, by which the plaintiffs in error were notified to appear on August 29, 1908. The return to this writ was in these words and figures:

"Came to hand August 24, 1908, at 5:30 o'clock p. m.

"Executed the within warrant of forcible detainer upon the defendants, David B. Weber and Max Weber, partners as Weber Brothers, at 5:35 o'clock p. m., August 24, 1908, by delivering a true copy thereof to A. Weber, a brother of said David B. Weber and Max Weber, the said A. Weber then and there being over sixteen years of age and in possession of the premises described in the within warrant, holding the same for said David B. Weber and Max Weber, partners as Weber Brothers.

"Further executed the within warrant of forcible detainer upon the defendants David B. Weber and Max Weber, partners as Weber Brothers, by

posting a copy of the within warrant, and notice of the time and place of the meeting of the court in which the hearing is to take place, in a conspicuous place on the premises described in the warrant, to wit, on the front double doors to the entrance to the Masonic Theatre proper and in the lobby to said theatre which were then locked; the same being the most conspicuous and frequented place on or about the leased premises, at 5:50 p. m., August 24, 1908, at which time there was no member of the family either of David B. Weber or Max Weber over sixteen years of age on or about the leased premises with whom notice could be left, the said A. Weber having left the leased premises immediately after being served with a copy of the within warrant as above stated.

"The defendants David B. Weber and Max Weber are nonresidents of Kentucky and absent from said state, and said David B. Weber and Max Weber not found in my county.

"Witness my hand this twenty-fifth day of August, 1908."

On August 26th the defendants therein filed a petition for the removal of the said case into the court below. On August 29th an order of removal was duly made, and the transcript filed in the Circuit Court. Thereupon the said defendants appeared in the court below, for the sole purpose of quashing "the notice or writ of forcible detainer," and did then and there move to quash the return on said notice or writ of forcible detainer. This motion was in writing, and was as follows:

"The defendants and each of them entering their appearances, and that of each of them specially and for the sole and special purpose of this motion, respectfully move the court to quash the notice or writ of forcible detainer herein issued by Ed. Meglemry, justice of the peace of Jefferson county, Kentucky, on August 24, 1908, and also to quash the return on said notice or writ of forcible detainer on August 25, 1908, by Chas. L. Scholl, sheriff of Jefferson county, Kentucky, by John W. Ullrich, deputy sheriff, upon the following grounds:

"Section 2,294, Ky. St. 1903, and section 454, Civ. Code Prac. Ky., are and each of them is, as applied to these defendants and each of them, each of whom is a nonresident of the state of Kentucky and absent therefrom, and each of whom is a citizen of the state of Illinois, residing in the city of Chicago, in said state, unconstitutional, because said sections and each of them deprive these defendants and each of them of liberty and property without due process of law, and deprive these defendants and each of them of privileges and immunities as citizens of the United States, contrary to the provisions of the fourteenth amendment to the Constitution of the United States."

This motion was overruled, and due exception taken. Thereupon a stipulation was filed submitting the issues of fact and law to the determination of the court, and waiving a jury.

Upon the testimony, the court made a finding of fact, quite specific and special, and upon this finding a conclusion of law that the lessors were entitled to be restored to the possession of the premises. The learned judge also filed an opinion, which has been properly made a part of the transcript.

From the judgment, the plaintiffs in error have sued out this writ and assigned errors.

George Du Relle and W. H. Field, for plaintiffs in error.

A. P. Humphrey and C. H. Fisk, for defendant in error.

Before LURTON, SEVERENS, and WARRINGTON, Circuit Judges.

LURTON, Circuit Judge (after stating the facts as above). The jurisdiction over the persons of the plaintiffs in error has been challenged at every step of the litigation, and their appearance has been at all times limited to an appearance solely for the purpose of denying the validity of the notice requiring them to answer to the writ of forcible detainer. This question must be disposed of before the merits of

the case can be properly considered. The point, shortly stated, is that the constructive notice, by posting a copy of the warrant and notice upon the premises and leaving a copy with a person over 16 years of age found in possession holding the premises for the plaintiffs in error, is not due process.

By section 452 of the Kentucky Civil Code of Practice (Carroll, 1906), a forcible detainer is defined as including "the refusal of a tenant to give possession to his landlord after the expiration of his term." By section 454 of the same Code the form of the warrant is prescribed, which includes a requirement that "at least three days' notice of the time and place of trial shall be given the defendant named in the warrant." Section 455 provides that the officer having the warrant shall give the notice according to the direction of the warrant.

The only issue involved under a forcible detainer suit, such as that at bar, was whether the relation of landlord and tenant had existed, and whether the term of the tenant had expired. Powers v. Sutherland, 1 Duv. (Ky.) 151; Taylor v. Monohan, 8 Bush (Ky.) 238; Mason v. Basconi, 3 B. Mon. (Ky.) 272; Beynroth v. Mandeville, 5 Bush (Ky.) 584. The judgment of the justice in such an action, if for the plaintiff, is only for a restitution of the premises and costs. Section 460, Code Civ. Prac. Ky. No question of title is involved, and the judgment is not a bar to an action of ejectment to recover the property by either party. Swanson v. Smith, 117 Ky. 117, 77 S. W. 700. Section 460 is part of a chapter which defines forcible entry and detainer and provides a remedy. But it does not deal with a case where actual notice cannot be given to the defendant. The Statutes of Kentucky, which for the most part constitute the substantive law of the state as distinguished from the Kentucky Code, which deals with questions of practice and procedure, expressly cover this matter in a chapter which defines the relation and rights of landlords and tenants. Section 2294 provides as follows:

"Forcible Detainer—how writ to be served.

"If the officer cannot find the defendant, in a writ of forcible entry or detainer, on the premises mentioned in the same, and there shall be no member of the defendant's family thereon over sixteen years of age with whom notice can be left, posting a copy of the notice of the time and place of the meeting of the court in a conspicuous place on the premises shall be deemed an execution of the notice; explaining and leaving a copy of it with a member of the defendant's family over sixteen years of age, if on the premises, shall also be a good service of the notice."

It is very plain that this provides for constructive notice whenever the defendant cannot be found on the premises, whether a resident or nonresident, citizen or noncitizen, of the state. In Swanson v. Smith, 117 Ky. 117, 77 S. W. 700, cited above, constructive notice, by leaving a copy of the warrant and notice with the wife of the defendant, was held a good service, although the defendant was only temporarily absent from the county.

But it is said that this section of the Kentucky Statutes is not now in force, having been repealed by Act March 29, 1902, p. 272, c. 122, being an act entitled "An act to regulate proceedings in civil actions in circuit courts." The repealing clause is the thirteenth section,

and reads, "All provisions of the Code of Practice in conflict with this act are hereby repealed, so far as in conflict." Obviously, there is no express intention to repeal section 2294 of that body of substantive law known as the "Kentucky Statutes," and neither section 2294, nor any other provision of the Kentucky Statutes, is repealed, unless there is such a conflict as that the two cannot stand together. But for section 2294, the provisions of sections 454 and 455 of the Code of Civil Practice, providing only for notice to the defendant in a warrant of unlawful detainer, would be applicable. But section 2294 of the Kentucky Statutes is a later provision, applying directly to writs of forcible detainer, and supplies a mode of service in circumstances not covered by any provision of the older Code of Civil Practice.

But the argument, if we understand counsel, is that the repealing clause of this act of 1902 is equivalent to a re-enactment of every clause of the Code of Practice not in conflict, and that by such re-enactment, through recognition, section 455 became the later law, and, by implication, repeals section 2294 of the Statutes of Kentucky. The argument is not convincing. Repeals by implication are not favored, and must result from an evident intention based upon the impossibility of two statutes standing together. Passing by the effect of the later act of February 29, 1904 (Laws 1904, p. 26, c. 4), re-enacting specifically every section of Carroll's 1903 edition of the Kentucky Statutes, which included section 2294, we are content to rest our judgment upon the proposition that the act of 1902 did not by necessary implication repeal that important provision in the chapter upon "Landlord and Tenant." This conclusion finds support in the fact that the Kentucky Court of Appeals recognized it as in force, holding that a service by leaving a copy of the warrant and notice with the wife of the defendant, being a member of his family, was a valid service. This recognition of the act as valid and applicable was in December, 1903, more than one year after its supposed repeal by implication. Swanson v. Smith, 117 Ky. 117, 120, 77 S. W. 700.

It is next said that section 2294 violates the fourteenth amendment of the federal Constitution, in that such constructive notice as there provided for is not due process, as applied to defendants who are not citizens or residents of the state. Prior to that provision, as we have before said, there was no method for obtaining jurisdiction under the special remedy of forcible detainer where the defendant could not be served in person. Lewis v. Outten, 32 Ky. 92. Section 455 of the Civil Code of Practice directs that the defendants in forcible entry and detainer shall be given notice. Section 2294 provides how such notice shall be given where the defendant is not found upon the premises. It substitutes constructive notice for actual notice.

The remedy of forcible detainer is a special, speedy, and almost summary one. Donelan v. Draddy, 107 Ky. 339, 343, 53 S. W. 1038. It is, in its widest sense, a statute of peace, and is intended to prevent resort to force. The defense is not guilty. The only judgment is restitution. No title or right is in issue. The single question is whether or not the defendant forcibly detains the premises from

the plaintiff.   The matter involved is real estate situated within the state.   If the tenant does not reside upon the premises, or cannot be found there because he resides out of the state, why may not the state provide how the notice in a proceeding against such a tenant shall be served?   That it is within the power of a state to provide for giving constructive notice to nonresidents through publication, and thereby obtain jurisdiction to determine the right and interest of any such nonresident in real estate situated within the boundaries of the state, is now too well settled by repeated decisions of the Supreme Court.   Such a method is essential to the determination of titles and constitutes due process, if the publication pursues the statute and the notice is of a character which presumptively gives knowledge of the proceeding and affords reasonable time to appear and defend.   Arndt v. Griggs, 134 U. S. 316, 323, 10 Sup. Ct. 557, 33 L. Ed. 918; Connor v. Tenn. Cent. Ry. Co., 109 Fed. 931, 48 C. C. A. 730, 54 L. R. A. 687; Huling v. Kaw Valley Rd. Co., 130 U. S. 559, 9 Sup. Ct. 603, 32 L. Ed. 1045; Ballard v. Hunter, 204 U. S. 241, 262, 27 Sup. Ct. 261, 51 L. Ed. 461; Longyear v. Toolan, 209 U. S. 414, 28 Sup. Ct. 506, 52 L. Ed. 859.

Inasmuch as a proceeding in forcible detainer involves only the immediate right of possession of a particular parcel of real property, it is in the nature of a proceeding in rem.   But whether technically so or not, the question we have to deal with is whether a statute of the state which authorizes such a proceeding upon constructive notice, when the defendant is not found upon the premises, is due process.  In Arndt v. Griggs, cited above, a statute of Iowa authorized a suit in equity for the purpose of removing clouds from titles of lands within the state, and that nonresidents claiming any interest in the lands involved might be given notice by publication, etc.   It was objected to a decree against a nonresident, by which title to land in the state had been cleared by such a proceeding to which he was a party only by constructive notice, that such a proceeding was one in personam, and therefore void without actual service of process.   To this, Mr. Justice Brewer said:

"While these propositions are doubtless correct as statements of the general rules respecting bills to quiet title, and proceedings in courts of equity, they are not applicable or controlling here.  The question is not what a court of equity, by virtue of its general powers and in the absence of a statute, might do, but it is, what jurisdiction has a state over titles to real estate within its limits, and what jurisdiction may it give by statute to its own courts, to determine the validity and extent of the claims of nonresidents to such real estate?  If a state has no power to bring a nonresident into its courts for any purposes by publication, it is impotent to perfect the titles to real estate within its limits held by its own citizens; and a cloud cast upon such title by a claim of a nonresident will remain for all time a cloud, unless such nonresident shall voluntarily come into its courts for the purpose of having it adjudicated.  But no such imperfections attend the sovereignty of the state.  It has control over property within its limits; and the condition of ownership of real estate therein, whether the owner be stranger or citizen, is subjection to its rules concerning the holding, the transfer, liability to obligations, private or public, and the modes of establishing titles thereto. It cannot bring the person of a nonresident within its limits—its processes go not out beyond its borders—but it may determine the extent of his title

to real estate within its limits, and for the purpose of such determination may provide any reasonable methods of imparting notice. The well-being of every community requires that the title of real estate therein shall be secure, and that there be convenient and certain methods of determining any unsettled questions respecting it. The duty of accomplishing this is local in its nature; it is not a matter of national concern or vested in the general government; it remains with the state; and, as this duty is one of the state, the manner of discharging it must be determined by the state, and no proceeding which it provides can be declared invalid, unless in conflict with some special inhibitions of the Constitution, or against natural justice. So it has been held repeatedly that the procedure established by the state, in this respect, is binding upon the federal courts."

The bringing of nonresidents before the courts of equity by the constructive service of publication has been the constant practice in Kentucky. Newcomb's Ex. v. Newcomb, 76 Ky. 565, 26 Am. Rep. 222. The purpose of notice is to give the defendant an opportunity to appear and be heard with respect to his property. The manner in which it is to be given and the time within which he may appear are subject to the discretion of the Legislature, provided always that it be of such character as to raise a reasonable presumption that the defendant, if he exercises that degree of care about his property which ordinary men do exercise, will learn of the proceeding and as to where and when he may defend. If the legislative provision have reasonable regard to the character of the proceeding and the probabilities that the owner of the property will be advised, it is due process. But if either the time or the kind of notice are so unreasonable, having regard to the proceeding and the reasonable necessities of the case, as not to create a presumption that the defendant will be warned in time to defend, it will not be due process. To declare a state statute, providing for constructive notice against nonresidents in respect to real estate within the state, void, as not being due process, either by reason of the kind or time of notice, must require a very clear case. Bellingham B. & Rd. Co. v. New Whatcom, 172 U. S. 314, 19 Sup. Ct. 205, 43 L. Ed. 460; Ballard v. Hunter, 204 U. S. 241, 262, 27 Sup. Ct. 261, 51 L. Ed. 461; Boyd v. Ellis, 11 Iowa, 97. The particular case we have before us, that of a tenant holding over after expiration of his term, seems to present no serious question as to the reasonableness of the manner of giving notice or the time for an appearance. There is nothing unreasonable in presuming that such a tenant would receive information by a notice posted on the doors of the premises in dispute within the time he was required to appear. That they did so in ample time is a fact which, if of no other significance, is indicative of the reasonable character of the notice. Men, whether residents or nonresidents, are presumed to make contracts with reference to the laws of the state in which the subject-matter of the contract, if real estate, is situated.

In the case of Broderick's Will, 21 Wall. 503, 519, 22 L. Ed. 599, Mr. Justice Bradley, in considering the basis upon which proceedings in rem are binding, said:

"Those who claim an interest in persons or things must be charged with knowledge of their status and condition."

In Ballard v. Hunter, 204 U. S. 241, 262, 27 Sup. Ct. 261, 269, 51 L. Ed. 461, the court, in considering the dominion of the state over land within its borders and the necessity of recognizing proceedings which affect the rights of nonresidents through constructive service, said:

"It should be kept in mind that the laws of a state come under the prohibition of the fourteenth amendment only when they infringe fundamental rights. A law must be framed and judged of in consideration of the practical affairs of man. The law cannot give personal notice of its provisions or proceedings to every one. It charges every one with knowledge of its provisions; of its proceedings it must, at times, adopt some form of indirect notice, and indirect notice is usually efficient notice when the proceedings affect real estate. Of what concerns or may concern their real estate men usually keep informed, and on that probability the law may frame its proceedings; indeed, must frame them, and assume the care of property to be universal, if it would give efficiency to many of its exercises. This was pointed out in Huling v. Kaw Valley Railway & Improvement Company, 130 U. S. 559, 9 Sup. Ct. 603, 32 L. Ed. 1045, where it was declared to be the 'duty of the owner of real estate, who is a nonresident, to take measures that in some way he shall be represented when his property is called into requisition; and, if he fails to get notice by the ordinary publications which have been usually required in such cases, it is his misfortune, and he must abide the consequences.' It makes no difference, therefore, that plaintiffs in error did not have personal notice of the suit to collect the taxes on their lands, or that taxes had been levied, or knowledge of the law under which the taxes had been levied."

In view of the character and purpose of a proceeding for forcible detainer under the Statutes of Kentucky, we conclude that section 2294 is not void as not affording due process.

We now come to the merits. This aspect of the case turns upon an extension clause in the lease, which was in these words:

"It is further understood and agreed by and between lessor and lessees that at any time, not less than six months before the termination of this lease, if all stipulations, covenants and agreements herein entered into by lessees shall have been fully carried out, performed and executed by them, the lessees shall have the option to extend the terms of this lease for an additional period and term of five (5) years, provided said lessees will agree and covenant to pay for said leased premises the highest amount of rent which can be secured by and which shall be offered to lessor therefor by any responsible party."

The obvious meaning of this is that the lessees have the option for an extension of five years, provided they should exercise it not less than six months before the lease expired by agreeing and covenanting to pay a rent equal to the highest offer which the lessors might secure from a responsible lessee before the expiration of the lease. This covenant or agreement as to the rental of the extended term is not that they will pay the highest responsible offer which the lessor may then have, but the highest that "can be secured," the highest which "shall be offered" before the new term shall begin. The indefinite rental is to be made definite, if no agreement has been come to, by the amount of the best responsible offer made to the lessor before the old lease shall terminate. This is the construction which the court below put upon the extension clause, and is the construction which the parties themselves put upon it, as shown by their letters and conduct.

The fourth finding of fact made by Judge Evans is in these words:

"That on October 21, 1907, the lessees, Weber Bros., wrote and delivered to the Grand Lodge of Kentucky (F. & A. M.), the lessor, a communication in the following language, namely:

"'Louisville, Ky., October 21, 1907. To the Masonic Grand Lodge of Kentucky, F. & A. M.: Notice is hereby given under lease made by the Masonic Grand Lodge, party of the first part, and David B. and Max Weber, party of the second part, wherein under said lease notice must be given six months prior to the expiration of the five years, of the intention of renewal of the lease. We hereby avail ourselves of the option and the herein notice is hereby given in conforming with said lease.          "'Weber Bros.'

"But the court finds that the lessees did not at any time otherwise 'agree or covenant' to pay the highest amount of rent offered the lessor for the premises, nor, otherwise than as may be shown in said communication in writing, tender any agreement or covenant to do so."

The fifth and sixth findings of fact deal with what was done, and include the correspondence. They are as follows:

"(5) That nothing more in respect to the matter was done by either party to the contract until February 22, 1908, on which date a communication in writing was sent by the lessor to, and on the next day it was received by, the lessees, and which communication was as follows, viz.:

"'Louisville, Ky., February 22, 1908. Messrs. Weber Bros., Chicago, Ill. Gentlemen: We beg to acknowledge receipt of your letter of recent date, notifying this board that you desire to avail yourselves of the opinion contained in your lease with the Grand Lodge of Kentucky F. & A. M., for the Masonic Theatre in this city. We beg to advise you that we have had an offer for a considerable higher rent than called for in the terms of the present lease. We shall be very glad to take up this matter with you either in person or with your representative, at any time in the near future that is agreeable to yourself. We await with interest your further advices.'

"Nothing further was ever heard of or done with the 'offer' referred to in this communication. It was never otherwise mentioned to the lessees, nor was any claim otherwise ever based upon it by the lessor. Said offer was afterwards always ignored and disregarded by both lessor and lessees, and it was not made by a 'responsible party.'

"(6) That thereafter the following communications in writing passed between the parties on the respective dates named in them, to wit: The lessees sent to lessor the following letter:

"'Chicago, Ill., February 25, 1908. In answer to yours of the 22nd inst. I have this day sent letter to Mr. Samuel A. Lederman, with the firm of Kohn, Baird & Spindle, attorneys at law. Kindly take up our negotiations for extension of Masonic Theatre lease with him.'

"To which the lessor replied as follows:

"'February 26, 1908. We are in receipt of your favor of the 25th inst., requesting that we take up negotiations for the extensions of the Masonic Theatre lease with Mr. Samuel Lederman. We are writing to Mr. Lederman to-day and hope to be able to have a conference with him in regard to this lease in the very near future.'

"The lessees then wrote as follows:

"'Chicago, February 29, 1908. Received yours of February 26th, also a letter from Mr. Lederman making it impossible for Mr. Lederman to act for us. As there is yet more than six months prior to the expiration of our lease, there is plenty of time for a conference over same and also when the lease provides for the five years extension, of which we have already availed ourselves. I shall be in Louisville sometime in May or June, which will be in plenty time to confer in the matter. Anything on the subject of importance, kindly advise us.'

"Later the lessor wrote as follows:

"'Louisville, Ky., April 7, 1908. Messrs. Weber Bros., Chicago, Ill. Gentlemen: It is the desire of this board to close the matter of a new lease for

the Masonic Temple Theatre at the very earliest possible moment, and since you have expressed your desire to avail yourselves of the option embodied in the present lease, we beg to inform you that we would like to close this matter up this week, and hope that you can make arrangements to be in Louisville in person.

" 'We might mention that we have had a bona fide proposition of an annual rental of $10,000.00 payable monthly in advance, and which includes the expenditure of not less than $10,000.00 for improvements in decorating and putting the theatre in first-class condition. This proposition also provides that we shall be paid one-half of the net receipts for the year, provided it amounts to more than $10,000.00.

" 'We have also had another proposition which is a verbal one of an annual rental of $15,000.00 a year; and still a third one which will be submitted to us, we think, in the next day or so.

" 'Kindly let the writer hear from you by wire promptly upon receipt hereof, exactly when we may expect you in Louisville.'

"The lessees replied as follows:.

" 'Chicago, April 9, 1908.   Dear Sir:   In answer to yours of April 7th. There is a great deal more to consider than a bona fide offer.  If you will look at our lease you will find the responsibility and other conditions will determine how much we are to pay.  We must have the names and addresses of all bona fide bidders, so that we may have an opportunity to look up their standing.  A verbal proposition is no proposition at all, a proposition based upon the receipts is no proposition for us to consider.  Under our lease we have until August 24th to negotiate and to determine how much we are to pay the next five years.  I expect to be in Louisville within ten days or two weeks.  I shall let you know the day before I arrive in Louisville.  My business here will not allow me to leave at this time.  A stock house will increase your rates of insurance.'

"And also as follows:

" 'Chicago, April 21, 1908.   Dear Sir:   I wish to notify you and through you the board of trustees and others that may wish to know, that I will be in Louisville the morning of May 5th to consult as to the future policy of the Masonic Theatre for which we hold lease.  At 11 a. m., of May 5th, I shall call upon the Grand Secretary, Bro. Grant, when you shall be able to find me.' "

The seventh and eighth findings relate to an offer made by the Boston Amusement Company, its incorporation, and the details of its proposal for the property.

The ninth finding was as follows:

"That the lessees, Weber Bros., on May 5, 1908, upon being shown the same, refused to meet the offer so made by the Boston Amusement Company, and have never agreed or covenanted, or offered to agree or covenant, to pay the higher amount of rent offered to be paid for the premises either by the Boston Amusement Company or by any other person, unless such agreement and covenant is contained in the letter of October 21, 1907.  As shown, however, in finding 3, the lessees, in the way and for the purpose therein stated, did on August 5, 1908, tender $300 to the lessor, which was refused."

The tenth finding is that on May 19, 1908, the lessor entered into a contract with the Boston Amusement Company upon the terms of the proposal made by it, the stipulated rental being for a much larger sum than the rental which the Weber Bros. had theretofore paid.

The eleventh and fourteenth findings are in effect that the Boston Amusement Company was "a responsible party," and the bond executed by them as a guaranty of performance of contract sufficient.

The twelfth and thirteenth findings were as follows:

"(12) That no offer was ever made by any named or responsible person to pay a higher rent for the premises than that offered by the Boston Amuse-

ment Company, nor was any offer other than that ever made by any named responsible person other than Weber Bros., who subsequently, under certain conditions, to wit, that they be allowed to have performances on Sundays and on the nights of the three days the premises would be occupied by the Grand Lodge, did offer to pay a higher rental, to wit, $10,000, but the lessor refused to rent the premises at all for Sunday performances, or for the three nights referred to. Who the other persons were, if any, referred to in the lessor's letter of April 7, 1908, as making higher offers, was not disclosed by the testimony, nor did the lessor ever insist upon the lessees meeting such other offers.

"(13) That after May 6, 1908, the lessor declined and refused to have further negotiations with Weber Bros., though the latter frequently requested it and insisted that they had a right to another term; but when so doing they did not agree or covenant nor offer to agree or covenant to pay any higher rent than they were already paying, except as stated in finding 12; nor did they ever retract their refusal to meet the offer of the Boston Amusement Company mentioned in finding No. 9."

Upon the facts thus found, the findings of law and conclusion of the court was that Weber Bros. were guilty of the forcible detainer complained of, and that the Grand Lodge was entitled to a judgment for the restitution of the premises and costs.

The communication of October 21, 1907, set out above, was not, in itself, an agreement and covenant, within the meaning of the extension clause of the lease. This notification was four months before the expiration of the right to exercise the option, and was regarded, as shown by subsequent conduct of both parties, as an expression of a purpose to obtain an extension. Strictly construed, the time within which the lessees might "agree and covenant," as provided by the lease, expired on February 23d. But the defendants in error seem to have regarded the question of an agreement as to such future rental as extending to time of expiration of the lease, and we shall assume that to be the situation. On February 22d, the lessor advised the lessees that it had an offer of a higher rent than called for by the existing lease. No specific information was given as to what the offer was or whether made by "a responsible party." Nothing more appears about the offer referred to, but the lessees did not then or at any later date "agree and covenant" to meet that offer if from a responsible party. On February 25th the lessees replied, saying that the negotiations would be taken up for them by one Mr. Lederman, acting for them. Nothing came of this, as Mr. Lederman could not or would not act. The letter of February 29th, set out above, shows that the lessees claimed that there was yet six months within which the rental might be fixed. The claim therein advanced is coupled with the insistence that they had "already availed themselves" of the option extended by the lease, referring to their letter of October 21st. When informed on April 7th of the proposals referred to in the letter of that date, they replied under date of April 9th, asserting "that they have until August 24th to negotiate and determine how much we are to pay the next five years." On May 5th the court found that when shown the detailed offer of the Boston Amusement Company they then refused to meet that offer, and that they never thereafter agreed to pay the higher rent so offered by that company, it being the offer of a responsible person.

Now, whether the right of the lessees to "agree and covenant" to pay for the extended term the higher rent which might be secured before expiration of the lease terminated on February 23d, when the option terminated, or extended to August 23d, they did not at any time so agree or covenant, if the letter of October 21st was not such covenant. But it is said that the lessor prematurely rented the property to the Boston Amusement Company, and that they refused to reopen negotiations after May 6th, when they refused to meet the offer of the Boston Amusement Company. Assuming that the lessees had until August 23d to meet the offer of that company, the lessor had a right to treat the refusal to meet that offer on May 5th as a definite refusal to avail themselves of the option and to act accordingly.

When in anticipation of the time of performance one definitely and specifically refuses to do something which he is obligated to do, so that it amounts to a refusal to go on with the contract, it may be treated as a breach by anticipation, and the other party may, at his election, treat the contract as abandoned, and act accordingly. The principle is well settled and applied in many cases. Hockster v. De la Tour, 2 Ed. & Bl. 678; Roehm v. Horst, 178 U. S. 1, 20 Sup. Ct. 780, 44 L. Ed. 953; Cherry Valley Iron Wks. v. Florence River Co., 64 Fed. 569, 12 C. C. A. 306; Michigan Yacht Co. v. Busch, 143 Fed. 929, 75 C. C. A. 109; McBath v. Jones Cotton Co., 149 Fed. 383, 79 C. C. A. 203.

But whether the refusal to accept the offer of the Boston Company might be treated as an abandonment of the contract before the time of performance or not, the matter is of no advantage to the plaintiffs in error, because they did not after that refusal, and before August 23d, agree or covenant to meet that rent. Only by so doing could they put themselves in a position of advantage in consequence of the premature renting of the property by the lessor, or in refusing to reopen negotiations.

There was no error in the judgment of the court below, and it is accordingly affirmed.

NOTE.—The following is the opinion of Evans, District Judge, in the court below:

EVANS, District Judge. The writ of forcible detainer in this case was issued by a justice of the peace. The lessees, Weber Bros., filed a petition and bond and removed the proceedings to this court, and the lessor's motion to remand it was overruled, upon the authority of Madisonville Traction Company v. St. Bernard Mining Company, 196 U. S. 239, 25 Sup. Ct. 251, 49 L. Ed. 462, which affirmed the same case in 130 Fed. 789.

Under the practice act (section 914, Rev. St. U. S. [U. S. Comp. St. 1901, p. 684]) we must endeavor to make the practice here conform as near as may be to the practice in the state courts in such cases as prescribed by sections 452–469 of the Civil Code of Practice. The practice in such cases, in the court of a justice of the peace at the outset, and in the traverse of the inquisition whereby the case could be removed to the circuit court of the state, is necessarily very different in detail from the practice here, where only one court of the first instance can have the case before it. However, no trouble seems to have come out of this circumstance, and the parties entered into and filed a stipulation in writing, waiving a jury and consenting to a trial by the court. The evidence was heard and the case argued at length, and in response to

the request of counsel the court has made separate findings of fact and conclusions of law, which will be filed and made part of the record.

The case has not been free from doubts as to the rights of the respective parties—doubts growing out of the obscurity of the clause in the lease upon which the controversy turns, especially as a similar characteristic is prominent in the letter or notice of October 21, 1907, written to the lessor by the lessees. The important clause in the lease is as follows: "It is further understood and agreed by and between lessor and lessees that at any time, not less than six months before the termination of this lease, if all stipulations, covenants, and agreements herein entered into by lessees shall have been fully carried out, performed, and executed by them, the lessees shall have the option to extend the terms of this lease for an additional period and term of five (5) years, provided said lessees will agree and covenant to pay for said leased premises the highest amount of rent which can be secured by and which shall be offered to lessor therefor by any responsible party."

It was clear enough that the lessees must exercise the option thus given them on or before the close of February 23, 1908 (that being the beginning of the six-months period) which time, from the standpoint of the lessor of the theater property, was evidently fixed for reasons which are obvious, inasmuch as such property can only be rented to a limited class of tenants, and time is needed to reach them. It is equally obvious that the lessees had the right to withhold action upon the option until the last moment of the last day preceding the beginning of the six months period. But whether the offer of the higher rent must also be obtained and communicated by the lessor to the lessees, and whether the lessees must finally act thereon before the beginning of the six-months period, are matters which are not in terms set forth in the lease. If they had been, it is probable that this controversy might have been avoided. If a proper interpretation of the contract requires the landlord to obtain offers in advance of the beginning of the six-months period, so as to be always ready to communicate them to the lessees as soon as the latter declared his purpose to take advantage of the option, then obviously there must be a judgment in favor of lessees, because no communication of a higher offer was made before February 24, 1908; it being entirely clear that the letter of the lessor, dated February 22, 1908, was insufficient, not so much in its indefiniteness in not naming the amount of the offer and the person who made it, as because the lessor never afterwards insisted upon that offer, and in fact it was always afterwards ignored and disregarded—a course of conduct which demonstrates that no reliance was ever placed upon it by the lessor as a factor in the questions to be solved, nor as the offer of a "responsible party." Furthermore, if the interpretation referred to is the correct one, the lessees were not bound to agree or covenant to pay any higher rent because none was offered by a responsible party prior to February 24, 1908, nor would they have been bound to meet the offer of the Boston Amusement Company, presently to be mentioned, inasmuch as that offer was not made until long after February 23, 1908, namely, on March 27, 1908.

But can that interpretation be the proper one? The notice that the lessees intended to exercise the option was given October 21, 1907; but that accidental circumstance as to date cannot itself fix the rule for determining what the contract means, in view of the fact, already referred to, that the lessees had the right to wait until February 23, 1908, before exercising their option at all. The rights (as distinguished from the opportunities) of the parties must be the same under the contract, whether the purpose to avail themselves of the option was manifested by the lessees upon any one day or another within the prescribed limit. It was frankly conceded by the learned counsel for the lessees that, if the notice that the option would be exercised had been given on February 23, 1908, the lessor would have had a reasonable time after that date to obtain offers of a higher rent, and that after notice of such offers was communicated to the lessees the latter would have had a reasonable time within which to investigate the responsibility of the parties making the offers, to determine whether to meet those offers, or any of them, by agreeing and covenanting to pay as much rent as the highest offer called for. No reasonable time clause, however, is found in the contract, and it must be put there by construction, if it gets in at all. The same may also be said as to giving "no-

tice." Giving notice would no doubt be a practical mode of procedure; but the contract says nothing about it. Notice, therefore, has probably been given more importance in the discussion than it was entitled to, thus minimizing the actual stipulations upon which the right to another five-year term was made to depend. The option and the right to exercise it were on the side of the lessees. They alone could say whether they would take the premises for another term, either at the old or at a higher rental. If they said they wanted a further term, they were entitled to it, not upon giving notice merely, but only upon the express and most important condition that they should "agree and covenant to pay for the leased premises the highest amount of rent which can be secured by and which shall be offered to lessor therefor by any responsible party."

No express language confines the operation of this clause in the contract to any particular time prior to August 23, 1908, and after a most careful consideration of the subject the court has reached the conclusion that it has no power under the facts of this case to do so by construction. We are, indeed, satisfied that the parties themselves did not so intend. We think the offer of March 27, 1908, was within time, and that the lessees were bound to meet it if they desired to continue their term another five years, unless the Boston Amusement Company was not a responsible party. The contract, as we have seen, gave the lessees the right to continue the term, provided they should "agree and covenant to pay" higher rent, etc. This proviso was the substantial element in the contract, without compliance with which the lessees could not entitle themselves to an extension of their term. It also seems to the court that their letter, or notice, dated October 21, 1907, does not of itself agree or covenant to do anything in the matter of paying a higher rent, and, as we have found the fact to be, they never otherwise at any time agreed or covenanted, or offered to agree or covenant, or tendered any agreement or covenant, to do that particular thing, although their right to an extension of their term depended upon it. That letter was as follows:

"Louisville, Ky., October 21, 1907.

"To the Masonic Grand Lodge of Kentucky, F. & A. M.: Notice is hereby given under lease made by the Masonic Grand Lodge, party of the first part, and David B. and Max Weber, party of the second part, wherein under said lease notice must be given six months prior to the expiration of the five years, of the intention of renewal of the lease. We hereby avail ourselves of the option, and the herein notice is hereby given in conforming with said lease.

"Weber Bros."

Though in express terms this writing is a "notice" that the lessees wanted to avail themselves of the right to extend the term, the contention of the lessees now is that it expressed, or should be construed as expressing, an agreement and covenant such as the lease calls for. While that might be true if no higher rent were offered, we do not think the contract admits of a construction which would so easily extend the term for five years longer, where a higher rent had been offered; and we are constrained to the conclusion that the letter does not agree or covenant to pay any higher rent, and that it was never intended so to agree nor covenant. This conclusion appears inevitable from the letter itself, and it is abundantly fortified by the correspondence and by the lessees' refusal to meet the offer of the Boston Amusement Company.

In cases where the meaning of a contract is doubtful or obscure, the court, in construing it, is at liberty to receive aid from the construction which the parties themselves have put upon it; and it is clear from the lessees' letters of February 29, 1908, and April 9, 1908, that they understood the contract to give the lessor until August 23, 1908, to do the things which their counsel now contends should have been done prior to February 24, 1908, or, at all events, prior to May 6, 1908. Instead of meeting the offer of the Boston Amusement Company, the lessees on May 5, 1908, explicitly refused to do so. After their refusal the lessor accepted the offer of that company. We by no means think that this act upon the part of the lessor, when viewed by itself, excluded or affected the right of the lessees at any time prior to August 24, 1908, to extend their term by agreeing and covenanting to pay the highest rent offered by any responsible person; but, although the lessees may have had the locus penitentiæ, even as to the offer of the Boston Amusement Company, until that

offer was accepted by the lessor, the lessees may possibly have been estopped, as between them and the Boston Amusement Company, at least, by their refusal on May 5th to meet that offer.

However these propositions may be in the abstract, the view we take is that the lessees never agreed and covenanted, nor offered to agree and covenant, to pay the higher rent offered by anybody except themselves. On the contrary, they seem studiously to have avoided making any such agreement or covenant at any time. This appears to be all the more significant when we recall that the contract did not require them to give any surety upon such agreement or covenant. It was to be made entirely upon their own credit and responsibility. We think they never made such agreement in any form, and by reason of their failure to do so never performed the essential condition precedent upon which their right to extend their term depended. With that offer outstanding they had no right to the premises for another term at $9,000 a year, while refusing or failing to meet a much higher offer made to the lessor. The lessees were only entitled to the leased property upon undertakings in a binding way to pay the higher rent offered. This undertaking they failed to make or offer to make.

We had some doubts about the responsibility of the Boston Amusement Company; but when we reflected that this litigation, per se, proved the very considerable earning capacity of the theater, that the capital stock and the guaranty bond largely supplemented that capacity, and that the lessor was satisfied with the security for the rent of its own property, we concluded that the lessor had the advantage upon this question under all the circumstances of a case where a higher offer had been made which the lessees had not only expressly refused to meet, but had entirely failed to agree and covenant to meet, although doing so was the express condition upon compliance with which alone they could become entitled to another term of five years. Under the terms of the lease for one five years the lessor was entitled to get for the next five years the highest rent any responsible party offered, and it would be neither just nor according to that contract to hold that the lessees should get the property without paying the increased rental.

Saying and giving notice that they intended to exercise the option was a very insignificant and easy task for the lessees, compared to the other provisions and conditions in the contract as to agreeing and covenanting to pay the higher rent. They did the easy thing of giving notice; but, as we have repeatedly said, they failed to do the altogether essential thing of agreeing to pay the highest rent.

Upon the whole case, we think the judgment should be that the lessor should have restitution of the premises and costs of the action.