BOARD OF COMMERCE OF ANN ARBOR, MICH., v. SECURITY TRUST
CO.

In re CLIMAX SPECIALTY CO.

(Circuit Court of Appeals, Sixth Circuit.   June 30, 1915.)

No. 2587.

1. BANKRUPTCY ☞333—CLAIMS—SUFFICIENCY OF EVIDENCE.
    A manufacturing company agreed with a board of commerce which fur-
nished it a factory site and defrayed the cost of moving its plant to main-
tain an annual pay roll in specified amounts for seven years, except and
contingent upon strikes, labor difficulties, fire, acts of elements, panics,
and other causes beyond the control of the company. The company
became bankrupt, having previously complied with its contract, and the
board filed sworn proof of its claim for the breach of contract, alleging
that the breach was not brought about by strikes, etc.   Held, that the
proof of claim was prima facie proof that the breach of contract was not
so caused, and, in the absence of any evidence on the subject by the trus-
tee, sufficiently proved the claim.
    [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 519;  Dec.
Dig. ☞333.]

2. CONTRACTS ☞303—BREACH—EXCUSES FOR NONCOMPLIANCE—BANKRUPTCY.
    The company's bankruptcy was not included in the causes beyond the
control of the company which excused performance, since such general
words must be restrained to the genus of the contingencies named unless
the specified contingencies exhaust the genus, and bankruptcy, though it
may result from strikes, etc., is not ejusdem generis.
    [Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1409–1443;
Dec. Dig. ☞303.]

3. DAMAGES ☞78—LIQUIDATED DAMAGES OR PENALTY.
    A board of commerce in Michigan, which raised a fund to bring manu-
facturing plants to a city, contracted with a manufacturing company to
furnish it a free site and defray the cost of moving to such city, the com-
pany to maintain for seven years an annual pay roll in specified amounts,
it being further agreed that the penalty for a failure to maintain such
pay roll for two consecutive years should be the forfeiture of $10,000 as
liquidated damages.   It appeared that the anticipated expenditures by
the board amounted to about $10,000.   The company became bankrupt.
Held, that the stipulated sum was recoverable as liquidated damages,
since in Michigan damages are limited to compensation for the loss actu-
ally sustained if ascertainable, but, where the loss cannot be measured
by a pecuniary standard, the sum named by the parties, is recoverable as
damages, and, while neither the board nor its members were pecuniarily
injured by the company's breach, the board was contracting for the profit
to be derived by the community and citizens at large and generally, and
such profits were so conjectural, highly uncertain, vague, and incapable
of measurement as to authorize the parties to fix their own measure of
damages.
    [Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 157–163;  Dec.
Dig. ☞78.]

4. DAMAGES ☞78—CONSTRUCTION OF CONTRACT—WRITTEN AND PRINTED PRO-
    VISIONS.
    The contract with the provision for a penalty having been printed and
the words "as liquidated damages" interlined, it must be construed as if
"liquidated damages" only had been written.
    [Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 157–163;  Dec.
Dig. ☞78.]

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

5. CONTRACTS ⬅187—ACTIONS—CONTRACTS FOR BENEFIT OF THIRD PERSON.

The contributors to the fund raised by subscription could not recover for the company's breach, as in Michigan an unnamed third person cannot recover on a contract, although made in his behalf.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 798–807; Dec. Dig. ⬅187.]

6. DAMAGES ⬅80—LIQUIDATED DAMAGES OR PENALTY.

The liquidated damages recoverable would at most amount to $30,000, and not as claimed to $60,000, and this amount was not so unreasonable or unconscionable as to make the stipulation one for a penalty, though the same amount would be due whether there was no pay roll for the whole of two years, or whether the pay roll continued but was substantially smaller than the stipulated sum, and though the stipulation might induce the company to employ help it did not actually need in order to maintain its pay roll.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 170–175; Dec. Dig. ⬅80.]

7. DAMAGES ⬅76—LIQUIDATED DAMAGES OR PENALTY.

The stipulation was not as claimed merely collateral to the object of the contract, and hence intended to secure performance and not to compensate loss, as the maintenance of the agreed pay roll was the main purpose of the contract on the part of the board.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 154, 155; Dec. Dig. ⬅76.]

8. BANKRUPTCY ⬅318—CLAIMS PROVABLE—CLAIMS ACCRUING IN CONSEQUENCE OF BANKRUPTCY.

The company's bankruptcy disabled it from performing the contract and was an anticipatory breach thereof, and the board's claim for the liquidated damages for such breach was provable in bankruptcy under Bankruptcy Act (Act July 1, 1898, c. 541, 30 Stat. 562 [Comp. St. 1913, § 9647]) § 63a (4), authorizing the proof of claims founded upon an open account or a contract express or implied, notwithstanding Form No. 31 (89 Fed. xlii, 32 C. C. A. lxvi), requiring the creditor to state on oath that the bankrupt was "at or before" the filing of the petition indebted to such creditor; as notwithstanding this provision claims accruing in consequence of bankruptcy are provable.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 481, 482; Dec. Dig. ⬅318.]

9. BANKRUPTCY ⬅314—CLAIMS PROVABLE—CLAIMS ACCRUING IN CONSEQUENCE OF BANKRUPTCY.

Where bankruptcy disables the bankrupt from performing a contract, the claim for the anticipatory breach of the contract in consequence of the bankruptcy exists as of the date of the filing of an involuntary petition, and hence is provable, though the bankrupt is not necessarily dispossessed of his property or prevented from carrying on his business until the adjudication, as the adjudication finds the averment of an act of bankruptcy to be true as of the time it was made, and the bankruptcy necessarily ensues as of the date of the filing of the petition.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 469–473, 478, 483–487, 489, 490; Dec. Dig. ⬅314.]

Appeal from the District Court of the United States for the Eastern District of Michigan; Arthur J. Tuttle, Judge.

In the matter of the Climax Specialty Company, bankrupt; Security Trust Company, trustee. From an order affirming the rejection of a claim by the referee, the Board of Commerce of Ann Arbor, Mich., appeals. Reversed and remanded.

The appellant, Board of Commerce of Ann Arbor, Mich., is a corporation of that state. Its articles of incorporation are not in evidence and its powers appear only as disclosed by the testimony of its secretary, who was the only witness called in the case. He said, without objection, that it was organized for the purpose of promoting the growth and welfare of the city of Ann Arbor and that the articles so stated; that it was not a corporation for gain, but was allowed to hold property; that the articles were drawn broad enough so that it could make money for the city, if it had a chance to do so. Its members were mostly merchants of the city and it had a subscribed industrial fund of $40,000, of which not more than $10,000 were payable in any one year. This fund was to be used—a part of it had been used—to bring manufacturers and manufacturing companies to Ann Arbor. The result of this, no doubt, would be the upbuilding of the city to which he referred, through increased business activity and population, with the benefits and advantages of various kinds to the community naturally and necessarily resulting therefrom, if such companies carried on their business after coming to the city.

The industrial fund was raised by subscription of individuals payable to a trustee on assessment of not more than 25 per cent. in any one year, made by a committee of 15 of the members of the Board, and upon the recommendation of the Board.

When the subscriptions were paid, the trustee deposited the money in bank and it was checked out by the Board. The money must necessarily have been deposited in the name of the Board. The industrial fund was subscribed for the purpose of carrying out the work of the Board by citizens, most of whom were members of the Board, but some were not. "As an additional check, besides the Board of Commerce, as to whether or not an assessment should be made," the committee of 15 was organized to decide that question. The purpose of this was that subscribers who did not belong to the Board would have "also something to say about it." The fund was regarded as a fund of the Board, and the only control the committee of 15 had over it was to order an assessment.

The only limitations on the Board in spending the fund were that the expenditure should not be more than 25 per cent. of the subscribed fund in any one year, and that the committee should approve the assessment and get the money. The industrial fund had an auxiliary fund raised by a committee of the Board. The Board had a membership of from 200 to 225, with annual dues of $4. The subscriptions were not made to the Board directly, "because it was intended to be used entirely for the purpose of bringing manufacturing companies there." In addition to this fund, the Board raised money and spent it in a variety of ways outside of bringing in manufacturing corporations.

Prior to the advent of the Climax Specialty Company, whose contract with the Board furnishes the subject-matter of this controversy, the Board had, in pursuance of its purposes, built a plant for the Newton Ladder Company, which had moved to Ann Arbor, having furnished to it the money for moving and for its factory, and there had been returned to the Board some of the money advanced by it out of the industrial fund to the Haggerty Ladder Company.

The Climax Specialty Company, a corporation of New York, doing business at Rochester, had a factory there, presumably upon its own land, and, on January 26, 1910, entered into the contract with the Board of Commerce set forth in the margin [1]; the italicized parts within brackets being interlineations

---

[1] "This agreement made this 26th day of January, A. D. 1910, by and between the Board of Commerce of Ann Arbor, a corporation duly incorporated and organized under the laws of the State of Michigan, hereinafter called the Board of Commerce, party of the first part, and the Climax Specialty Company of Seneca Falls, New York, a corporation duly incorporated and organized under the laws of New York and John C. Davis of Seneca Falls, New York, parties of the second part and hereinafter called in this agreement the Climax Specialty Company, witnesses:

"The Board of Commerce agree to procure and deed to the Climax Specialty Company a suitable factory site, containing four or five acres of land, such factory site to be selected by the Climax Specialty Company from sites offered by the Board of Commerce.

"The Board of Commerce agree to defray the cost of moving the plant of the Climax Specialty Company from Seneca Falls, New York, to Ann Arbor and of erecting the ma-

inserted before the contract was executed. It was drawn by the president and secretary of the board, the interlineations relating to contingencies of strikes, labor difficulties, etc., and other causes beyond the control of the company, being inserted at the request of the president of the company, or his agent; the interlineation, "as liquidated damages," being inserted by those who drew the contract, one of whom, the secretary, testified without objection: "We did that ourselves, our object being—we knew we were spending $10,000; we knew that." In answer to the question, "State whether or not when this sum of $10,000 was put in the contract you then had in mind these expenditures, and that it was possible that the Board of Commerce might lose an amount in the neighborhood of $10,000," he said, "We expected that the expenditures would be about $10,000."

The company moved to Ann Arbor. Its expenses for that purpose, about $7,500, were paid by the Board by its checks, and a site for its new factory was furnished by the Board at a cost of $2,500. It is fairly to be inferred that the Board did sell for the company the $75,000 in bonds, as agreed, and complied in all respects with its promises.

The evidence does not show when the company began operations at its new location, or their extent, or the amount of its pay roll. It does not appear from the record that the company ever actively prosecuted its business at Ann Arbor. In one of his opinions, the referee said: "It is undisputed that there

chinery in the plant here up to an amount not to exceed seven thousand five hundred dollars ($7,500.00), payments to be made promptly from time to time as the expenses are incurred.

"It is agreed that on or before thirty days from the date of this agreement the capital stock of the Climax Specialty Company is to be increased to two hundred thousand dollars ($200,000.00), par value, either by reincorporation or otherwise; that a bond issue of one hundred thousand dollars ($100,000.00), bearing interest at 6%, maturing as later agreed upon, is to be authorized and placed in the hands of a trustee to be agreed upon, that this bond issue is to be secured by the real estate of the Climax Specialty Company in Seneca Falls, except the residence of John C. Davis and Ann Arbor. * * *

"That this issue of bonds, seventy-five thousand dollars ($75,000.00) is to be set aside for the completion of a new factory plant in Ann Arbor and their machinery and for the payment of the present debts of the Climax Specialty Company and to provide for future working capital. * * *

"The Board of Commerce agree to sell the first seventy-five thousand dollars ($75,000.00) of bonds issued under the one hundred thousand dollars ($100,000.00) authorization within sixty days of the signing of this contract by the Climax Specialty Company and the proceeds of such sale shall be held by the trustee of the mortgage to be used and expended for the following purposes and as follows:

"First.—Thirteen [seventeen] thousand five hundred dollars ($13,500.00) [$17,500.] for the payment of the bank indebtedness of the Climax Specialty Company in Seneca Falls, which payment shall include the discharge of all mortgages or liens against the property of said Climax Specialty Company or John C. Davis in Seneca Falls.

"Second.—To pay for the erection of the buildings at Ann Arbor according to the plans and specifications now on file with the Board of Commerce. [Payments to be made according to terms agreed with contractor.]

"Third.—The balance of the seventy-five thousand dollars ($75,000.00) provided by the sale of the bonds to be turned over to the Climax Specialty Company upon the removal of their entire plant to Ann Arbor and the beginning of full operation of said plant in Ann Arbor.

"The payments by the trustee are to be made upon orders signed by the Climax Specialty Company and the Board of Commerce.

"In consideration of the foregoing and one dollar ($1.00) in hand paid, the Climax Specialty Company and John C. Davis agree to remove the entire plant of the Climax Specialty Company from Seneca Falls, New York, to Ann Arbor, Michigan. They agree to maintain a pay roll, exclusive of the salary of manager or superintendent, or salesmen on the road, at their factory in Ann Arbor of fifty thousand dollars ($50,000.00) the first year after their removal to Ann Arbor [January 1, 1911], of seventy-five thousand dollars ($75,000.00) the second year and of one hundred and fifty thousand dollars ($150,000.00) for each of the succeeding five years. It is agreed that the penalty for failure to maintain a pay roll as agreed upon for two consecutive years shall be the forfeiture of ten thousand dollars ($10,000.00) [as liquidated damages] by the Climax Specialty Company to the Board of Commerce, [except and contingent upon strikes, labor difficulties, fire, acts of elements, panics and other causes beyond the control of the Climax Specialty Co.] * * * "

was no breach of contract prior to the filing of the petition in bankruptcy." In view of this statement and the fact that counsel in their arguments and briefs make no point to the contrary, it may be assumed that the factory was operated up to the date, May 10, 1911, the petition in bankruptcy was filed; but as the contract was made January 26, 1910, and the pay roll was to be maintained for the certain years beginning January 1, 1911, it may fairly be inferred, since a new plant must be constructed, that its active operations did not begin a considerable length of time before January 1, 1911.

The company was adjudged a bankrupt by its consent July 24, 1911. Thereupon the Board filed with the referee its "Proof of Claim" against the bankrupt's estate, asserting an indebtedness of $10,000, for which the consideration was alleged to be set forth in its contract and in which its claim was def-· initely described as follows: "* * * That said claim is for the liquidated damages of ten thousand dollars ($10,000.00) provided for in said contract, and that said Climax Specialty Company did not, as provided for in said contract, maintain a pay roll, exclusive of the salary of the manager or superintendent and salesmen on the road, at their factory in Ann Arbor, of fifty thousand dollars ($50,000.00) for the first year after January 1, 1911, and that there have been no strikes, labor difficulties, fires, acts of the elements, panics or other causes beyond the control of said Climax Specialty Company to prevent it from maintaining said pay roll."

On objections by the trustee in bankruptcy, the referee found the designated sum to be a penalty; that the Board was not and could not be financially injured by reason of the failure of the bankrupt to maintain its pay roll; that no moneys, if recovered by the Board, would be repaid, in whole or in part, to any of the parties contributing to the fund; that no damages had been proved by the plaintiff; that the proof of claim based on the breach of contract does not prove itself and is in the nature of unliquidated damages; can only be allowed after proper proof and is not entitled to allowance under section 57d of the Bankruptcy Act (Comp. St. 1913, § 9641), because the claim is not provable; that the contract could be enforced, if at all, only to the extent that actual damages are proved; that the debts of the estate were large and the assets only nominal; that the claim was not based on any actual damages sustained upon any moneys expended; that the moneys of the estate should not be paid upon such claims unless established and sustained by clear and convincing evidence and by rules of law that are unquestioned; that under Zavelo v. Reeves, 227 U. S. 625, 33 Sup. Ct. 365, 57 L. Ed. 676, Ann. Cas. 1914D, 664, the claim could not be filed and allowed, since it did not exist at and before the filing of the petition in bankruptcy; and that therefore the claim was not provable.

The referee rejected the claim, his action being affirmed by the District Court.

In the assignments of error, it is claimed the court erred in sustaining the objections of the trustee based upon the grounds that: (1) The bankrupt was not indebted to the claimant; (2) the contract was against public policy; (3) the contract was lacking in mutuality; (4) the claimant had not performed its obligations to be performed; (5) the claimant had not suffered any damage by reason of the failure of the bankrupt to maintain a pay roll of $50,000 for the year beginning January 1, 1911; (6) if there was any damage, it was speculative in character; (7) the stipulated damage was a penalty; (8) the bankrupt was prevented, by causes beyond its control, from complying with its contract; (9) the bankrupt was prevented from fulfilling its contract in large measure by labor difficulties and panics which were causes beyond its control; and (10) the claimant had not a provable claim.

The second, third, fourth, eighth, and ninth assignments may be disposed of by the statement that no reason is given—and none appears—why the contract is against public policy, or is lacking in mutuality, or was not performed by the Board of Commerce according to its terms, or compliance by the company was prevented by any causes beyond its control.

The other assignments are now dealt with upon a consideration of the three questions, whether or not: (1) The claimant has sufficiently proved his claim; (2) the claim is for liquidated damages, or is for a penalty; and (3) the claim is provable in bankruptcy.

II. B. Graves, of Detroit, Mich., for appellant.

A. E. Fixel, of Detroit, Mich., for appellee.

Before WARRINGTON and DENISON, Circuit Judges, and HOLLISTER, District Judge.

HOLLISTER, District Judge (after stating the facts as above). [1, 2] The objection that the claim is not sufficiently proved is based upon the fact that from the evidence it does not appear the breach of contract by the company was not brought about by strikes, labor difficulties, fires, acts of the elements, panics, or other causes beyond its control. In the sworn proof of claim these negatives were clearly alleged, and, in the absence of proof to the contrary, are held to be sufficiently proved under the Bankruptcy Act, since such allegations are prima facie evidence and the sworn proof of claim is some evidence, even when it is denied. Whitney v. Dresser, 200 U. S. 532, 26 Sup. Ct. 316, 50 L. Ed. 584. These designated exceptions and contingencies are all matters which were peculiarly within the knowledge of the company. Under such circumstances, the prima facie proof of the proof of claim itself must stand, unless the one against whom the averment was made shows an excuse from compliance by proving the causes named. This is clearly held in United States v. Denver, etc., R. R. Co., 191 U. S. 84, 92, 24 Sup. Ct. 33, 35 [48 L. Ed. 106], in which Mr. Justice Brown said:

"When a negative is averred in pleading, or plaintiff's case depends upon the establishment of a negative, and the means of proving the fact are equally within the control of each party, then the burden of proof is upon the party averring the negative; but when the opposite party must, from the nature of the case, himself be in possession of full and plenary proof to disprove the negative averment, and the other party is not in possession of such proof, then it is manifestly just and reasonable that the party which is in possession of the proof should be required to adduce it; or, upon his failure to do so, we must presume it does not exist, which of itself establishes a negative."

So far as appears, the breach of the contract was caused by the bankruptcy of the company. But what caused the bankruptcy is left to conjecture. In many cases, no doubt, the status of bankruptcy may result from circumstances over which the failing debtor has no control. But often it is his own fault. In any event, as against the negative averment in the proof of claim, the trustee must show that the condition of bankruptcy was brought about by circumstances beyond the company's control. He has offered no evidence on the subject.

In addition to this, it may be said that bankruptcy is not a cause of the same kind as strikes, labor difficulties, fires, acts of elements, and panics. Bankruptcy may, indeed, be the result of these, but it is not ejusdem generis. They have to do with unforeseen contingencies and calamities arising from without, and operating upon, the company or its property, independent of the company's personal conduct of its business and the manufacture and sale of goods, and are causes which really may be, and are treated in this contract as being, beyond the control of the company. Such general words as, "other causes beyond the control of the company," must be restrained to the genus of the contingencies named (Sandiman v. Breach, 7 Barn. & Cres. 96,

99; Hawkins v. Great Western Railroad, 17 Mich. *57, *62, 97 Am. Dec. 179; Hickman v. Cabot, 183 Fed. 747, 106 C. C. A. 183), unless the specified contingencies exhaust the genus (United States v. Mescall, 215 U. S. 26, 30 Sup. Ct. 19, 54 L. Ed. 77). The rule is to be applied here, and not the exception; for, as pointed out by counsel, war, riot, and pestilence are contingencies which might well have been mentioned with the others. Assuming for the present the claim to be provable, we think it sufficiently proved.

[3] The case calls for the proper construction to be given the company's agreement:

"They (the company) agree to maintain a pay roll, exclusive of the salary of manager or superintendent, or salesmen on the road, at their factory in Ann Arbor of fifty thousand dollars ($50,000.00) the first year after their removal to Ann Arbor [*January 1, 1911*], of seventy-five thousand dollars ($75,-000.00) the second year and of one hundred and fifty thousand dollars ($150,-000.00) for each of the succeeding five years. It is agreed that the penalty for failure to maintain a pay roll as agreed upon for two consecutive years shall be the forfeiture of ten thousand dollars ($10,000.00) [*as liquidated damages*] by the Climax Specialty Company to the Board of Commerce. * * *"

—and involves a subject concerning which there is much confusion and contrariety of opinion in many of the decisions involving contracts in which, for a breach, a fixed sum is named to be recovered by the injured party, sometimes called a "penalty" and sometimes "liquidated damages." In some cases "penalty" has been construed "liquidated damages," and in some, "liquidated damages" has been construed a "penalty," the courts disregarding the exact language and its legal significance, which, under the usual rules of construction, would be taken as indicating the intention of the parties.

If the contract is construed to mean "liquidated damages," the recovery for a breach is the sum stipulated without proof of actual damage. If it is construed to mean "penalty," the recovery is only for the actual damage sustained.

Until comparatively recently, the tendency of the courts has been to favor a construction which would result in paying the injured party only the amount actually lost by the breach, rather than permit him to recover a liquidated sum, although the contract expressly provided for liquidated damages in the event of a breach. This was based upon the equitable consideration, applied also in courts of law, that for breach of contract a party ought not to recover more than he had actually lost, even if the strict language of the contract provided that he could do so.

The subject is discussed at length in Sun Print. & Pub. Ass'n v. Moore, 183 U. S. 642, 659, et seq., 22 Sup. Ct. 240, 46 L. Ed. 366, with copious references to the English decisions, prior decisions of the Supreme Court, and some of the state decisions; and again in United States v. Bethlehem Steel Co., 205 U. S. 105, 118, et seq., 27 Sup. Ct. 450, 455, 51 L. Ed. 731, in which it was said by Mr. Justice Peckham:

"There has in almost innumerable instances been a question as to the meaning of language used in that part of a contract which related to the payment of damages for its non-fulfillment, whether the provision therein made was one for liquidated damages or whether it meant a penalty simply, the damages to be proved up to the amount of the penalty. * * * The courts at

one time seemed to be quite strong in their views and would scarcely admit that there ever was a valid contract providing for liquidated damages. Their tendency was to construe the language as a penalty, so that nothing but the actual damages sustained by the party aggrieved could be recovered. Subsequently the courts became more tolerant of such provisions, and have now become strongly inclined to allow parties to make their own contracts, and to carry out their intentions, even when it would result in the recovery of an amount stated as liquidated damages, upon proof of the violation of the contract, and without proof of the damages actually sustained. * * * The question always is, what did the parties intend by the language used? When such intention is ascertained it is ordinarily the duty of the court to carry it out."

The rule therefore prevailing in the courts of the United States—and, it may be said, generally, in the state courts—is that "liquidated damages" may be read "penalty," and "penalty," "liquidated damages," according to the contract itself and the circumstances of the case; and that, when the parties have used the language "liquidated damages," the language chosen by them shall prevail in its legal meaning, unless the nature of the contract and the circumstances show an intention to provide a penalty.

But this contract was executed and was to be performed in Michigan, and must be construed in the light of decisions of the Supreme Court of that state. Liverpool Co. v. Phenix Ins. Co., 129 U. S. 397, 446, et seq., 9 Sup. Ct. 469, 32 L. Ed. 788; Hall v. Cordell, 142 U. S. 116, 12 Sup. Ct. 154, 35 L. Ed. 956. Whether, in the last analysis, the rule in Michigan is or is not different from that prevailing in the United States courts and generally, is not of importance, and we proceed to a consideration of the question in the light thrown upon it by the decisions of the Supreme Court of that state.

In Jaquith v. Hudson, 5 Mich. 123 (1858), Judge Christiancy is of opinion that the intention of the parties is immaterial, and that the court will construe the contract, whatever its language, in accordance with the fact, whether or not the stipulated sum was, under the circumstances, a "penalty," or "liquidated damages." He said (5 Mich. *137):

"* * * * The actual intention of the parties, in this class of cases, relating to this point, is wholly immaterial; and though the courts have very generally professed to base their decisions upon the intention of the parties, that intention *is not*, and *cannot be made*, the *real basis of these decisions.*"

He lays down two principles which, he says, result from, and reconcile, the great majority of cases, both in England and in this country (5 Mich. *133, *134):

"*First.* The law, following the dictates of equity and natural justice, in cases of this kind, adopts the *principle of just compensation* for the *loss* or *injury actually sustained;* considering it no greater violation of this principle to confine the injured party to the recovery of less, than to enable him, by the aid of the court, to extort *more.* It is the application, in a court of law, of that principle long recognized in courts of equity, which, disregarding the penalty of the bond, gives *only* the *damages actually sustained.* This principle may be stated, in other words, to be, that courts of justice will not recognize or enforce a contract, or any stipulation of a contract, clearly unjust and unconscionable; a principle of common sense and common honesty so obviously in accordance with the dictates of justice and sound policy, as to make it rather matter of surprise that courts of law had not always, and in all cases,

adopted it to the same extent as courts of equity. And, happily for the purposes of justice, the tendency of courts of law seems now to be towards the full recognition of the principle, in all cases.

"This principle of natural justice, the courts of law, following courts of equity, have, in this class of cases, adopted as the *law of the contract*; and they will not permit the parties by express stipulation, or any form of language, however clear the intent, to set it aside. * * *"

He then proceeds to declare the important qualification:

"But the court will apply this principle, and disregard the express stipulation of parties, *only* in those cases where it is obvious from the contract before them, and the whole subject-matter, that the principle of compensation has been disregarded, and that to carry out the express stipulation of the parties, would violate this principle, which alone the court recognizes as the law of the contract.

"The violation, or disregard of this principle of compensation, may appear to the court in various ways—from the contract, the sum mentioned, and the subject-matter. * * *

(5 Mich. *137) "The foregoing remarks are all to be confined to that class of cases where it was clear, from the sum mentioned and the subject-matter, that the principle of compensation had been disregarded."

He then calls attention to another class of cases (5 Mich. *137, *138):

"But, *secondly*, there are great numbers of cases, where, from the nature of the contract and the subject-matter of the stipulation, for the breach of which the sum is provided, it is apparent to the court that the actual damages for a breach are uncertain in their nature, difficult to be ascertained, or impossible to be estimated with certainty, by reference to any pecuniary standard, and where the parties themselves are more intimately acquainted with all the peculiar circumstances, and therefore better able to compute the actual or probable damages, than courts or juries, from any evidence which can be brought before them. In all such cases, the law permits the parties to *ascertain* for themselves, and to provide in the contract itself, the amount of the damages which shall be paid for the breach. In permitting this, the law does not lose sight of the principle of compensation, which is the law of the contract, but merely adopts the computation or estimate of the damages made by the parties, as being the *best* and *most certain mode* of ascertaining the actual damage, or what sum will amount to a just compensation. * * *

"In this class of cases, where the law permits the parties to ascertain and fix the amount of damages in the contract, the first inquiry obviously is, whether they have done so in fact? And here, the *intention* of the parties is the *governing consideration*; and in ascertaining this intention, no merely technical effect will be given to the particular words relating to the sum, but the entire contract, the subject-matter, and often the situation of the parties with respect to each other and, to the subject-matter, will be considered. * * * And in proportion as the difficulty of ascertaining the actual damage by proof is greater or less, where this difficulty grows out of the nature of such damages, in the like proportion is the presumption more or less strong that the parties intended to fix the amount."

This idea of compensation for the loss actually sustained, if it may be ascertained, and in the sum named by the parties as damages, in cases of such character that the loss cannot be measured by a pecuniary standard, runs through all the Michigan cases.[2] In some of them

[2] Jaquith v. Hudson, 5 Mich. 123, 137; Daily v. Litchfield, 10 Mich. 29, 37; Davis v. Freeman, 10 Mich. 188, 190, 191, 192; Richmond v. Robinson, 12 Mich. 193, 201, 202; Butterfield v. Seligman, 17 Mich. 95; Richardson v. Woehler, 26 Mich. 90; Trustees, etc., v. Walrath, 27 Mich. 232; Myer v. Hart, 40 Mich. 517, 523, 29 Am. Rep. 553; Whiting v. Village of New Baltimore, 127 Mich. 66, 71, 86 N. W. 403; Lamson v. City of Marshall, 133 Mich. 250, 262,

It is said the amount stipulated must not be excessive, unjust, unconscionable, or unreasonable; but as late as Calbeck v. Ford, 140 Mich. 48, 56, 57, 103 N. W. 516, 520 (1905), the court quote at length the views of Judge Christiancy, and follow the quotation with the statement:

"This case has been frequently referred to with approval, and is a clear and authoritative statement of the rule as expounded by this court."

In Ross v. Loescher, 152 Mich. 386, 388, 116 N. W. 193, 194, 125 Am. St. Rep. 418 (1908), the court, considering the question whether the stipulated amount in that case was a penalty or not, refer to Judge Christiancy's opinion and say:

"But the principle is there established that courts will 'disregard the express stipulation of parties, *only* in those cases where it is obvious from the contract before them, and the whole subject-matter, that the principle of compensation has been disrgarded.' "

And cite to the point, Ward v. Hudson River Bldg. Co., 125 N. Y. 230, 26 N. E. 256, to which reference will be made, and they have again given their interpretation of the rule so emphatically declared by that great judge:

"In cases where it is difficult to accurately determine the damages which one party may suffer by the failure of the other to perform his contract, the parties themselves may agree upon such sum as in their judgment will be ample compensation for the breach."

The application of these rules to the facts in this case is not uncertain; but, before stating our conclusion on this branch of it, consideration should be given to the effect of the interlineation, "as liquidated damages," and to the claim of counsel for appellee that in no event can the Board of Commerce itself, or its members, sustain any pecuniary injury from the breach of the contract.

[4] The first of these invokes the application of that rule in construing contracts, which gives force to a provision in handwriting as against an inconsistent printed provision. Thomas v. Taggart, 209 U. S. 385, 389, 28 Sup. Ct. 519, 52 L. Ed. 845; Pike's Peak, etc., Co. v. Power, etc., Co., 165 Fed. 184, 92 C. C. A. 392 (C. C. A. 8). So that, so far as the language itself is concerned, the parties intended to write "liquidated damages," and the contract (the intention as indicated by choice of language being immaterial) must be treated as if "liquidated damages" only had been written.

[5] The second must be dwelt upon at greater length, for it is true that neither the Board nor its members were, as such, pecuniarily injured by the failure of the company to keep its promise. It is not denied that the Board had the right to contract, but the trustee, we as-

263, 95 N. W. 78; City of Detroit v. People's Telephone Co., 135 Mich. 696, 98 N. W. 715; Calbeck v. Ford, 140 Mich. 48, 55, 56, 57, 103 N. W. 516; Township of Springwells v. Detroit, etc., Ry., 140 Mich. 277, 279, 103 N. W. 700; Western Gas Construction Co. v. Dowagiac Gas & Fuel Co., 146 Mich. 119, 109 N. W. 29, 10 Ann. Cas. 224; Powell v. Dwyer, 149 Mich. 141, 145, 146, 112 N. W. 499, 11 L. R. A. (N. S.) 978; Ross v. Loescher, 152 Mich. 386, 388, 116 N. W. 193, 125 Am. St. Rep. 418.

sume, would limit its recovery to nominal damages only, in any event—a conclusion, which, if true, would make this provision quite immaterial, whether it be regarded as a "penalty" or as "liquidated damages." Nor could the contributors to the fund recover, for, in Michigan, an unnamed third person cannot recover on a contract between the contracting parties, although made in his behalf. Pipp v. Reynolds, 20 Mich. 88; Knights, etc., v. Sharp, 163 Mich. 449, 128 N. W. 786, 33 L. R. A. (N. S.) 780.

The substance of the trustee's claim is therefore that the contract imposed no obligations on the company, and no one could recover for the company's breach; and this, too, although the Board had power to make money for the city, if it had a chance to do so, as said by the secretary. A court of justice will go a long way in withholding its acquiescence in such a conclusion. The purposes of the Board and the subscribers were public in their nature, looking to the financial, industrial, and social development of the city; the increase of its importance and prosperity, having in mind the many benefits and advantages, quite beyond possibility of enumeration, likely to follow the transplanting of so large a concern having an annual expenditure for pay roll in the amount designated. Not only would benefits result in a financial way by the expenditure of wages in the amounts of these pay rolls, though even such benefits are not susceptible of accurate measurement; but the possibilities in improvement to the city in many directions are easily conceivable which cannot be laid up against any pecuniary standard and which are not based on monetary considerations. All of these, the Board, the subscribers to the fund, and the company itself, must have had in mind as the consideration which was to flow from the compliance by the company with its promises, considerations in which the board and its members and the subscribers to the fund could have no direct pecuniary interest. These were the profits in the many ways suggested by the expenditure of the $10,000.

The Board, in its contract, was acting in a trust capacity. We have found no case involving the precise rights of such a Board in such a contract as is exhibited here, but we think the same principle will be found in cases in Michigan dealing with the rights of a public board in contracts in which a sum was fixed and held to be "liquidated damages," though the particular board, as such, or the municipal corporation it represented, could in no event suffer pecuniary damages from a breach.

In Whiting v. Village of New Baltimore, 127 Mich. 66, 86 N. W. 403, the village granted a franchise to one Dyar for an electric railroad, requiring a deposit of $2,000, to be returned upon the completion of the road within the time prescribed; in default of which the money was to be placed in the village treasury in such fund as the trustees of the village might direct. The sum deposited was held to be "liquidated damages," the road not having been completed within the time agreed upon. In the opinion, it was said (page 71 of 127 Mich., page 405 of 86 N. W.):

"It may be conceded that the village, in its corporate capacity, suffered no damages by failure to build the road; but the contract was made by the cor-

porate officers for and in the interests of the inhabitants, and for such damages they could and did agree with Mr. Dyar."

So, in City of Detroit v. People's Telephone Co., 135 Mich. 696, at page 698, 98 N. W. 745, at page 746, a case much like and following, the last cited, the court say:

"In that case, as in this, the municipal body, as such, suffered no damages by reason of the failure of the corporation to comply with the terms of its grant. But it was said that the contract was made by the corporate officers for and in the interest of the inhabitants. It might be added that their damages, likewise, would not be susceptible of proof, and this furnishes a strong reason for holding that the parties intended by their stipulation to treat such damages as liquidated."

In Township of Springwells v. Detroit, etc., Ry. Co., 140 Mich. 277, at page 280, 103 N. W. 700, at page 701, a street railroad company, in compliance with the terms of a franchise, gave a bond to secure the performance of its duty under the franchise, and the amount of the bond was held to be liquidated damages and not a penalty; the court saying:

"To hold that the parties in this case provided for a penalty, as contended by defendants, is to determine that they were at much pains to do an entirely idle and profitless thing. Such a construction ought not to be given to the agreement of the parties, if any other reasonable one is open to the court. The construction of a line of railway was the prominent thing in the minds of the parties. The weight of the rails, the gauge, the planking at crossings, and other details of construction, were merely the elements which were descriptive of and went to make up the completed whole. The bond in suit was intended to enforce a substantial performance of the contract for the benefit of the inhabitants of Springwells, and for that purpose provided for damages in default of such performance. The status of the parties, and the fact that otherwise no damages would be ascertainable, warrant the construction that the parties intended the provision for $10,000 as liquidated damages for a substantial failure to perform the entire contract, rather than as a penalty to secure the exact performance of each separate provision for construction."

It is clear enough that the mere removal of the company from Rochester to Ann Arbor and the construction of a new plant on the site provided would be of little advantage to the city of Ann Arbor. The purposes of the expenditure of $10,000 were for the benefits to be derived by the inhabitants from the continued operation of the plant, with the number of men contemplated by the expenditures for the pay rolls designated. If the plant were not operated at all, the loss to those who had contributed would be the $10,000, an expenditure in which the community was not concerned. The community's concern, for which the board was contracting, was the profit to be derived, from the ways suggested, by the community and citizens generally. and the Michigan rule becomes directly applicable, because such profits were conjectural, highly uncertain, vague, and not measurable in dollars and cents.

[6] But it is said the stipulated sum being applicable to any two years during which the certain pay rolls were to be maintained, there could be a recovery of $60,000, a sum disproportionate to the actual loss sustained and altogether unreasonable and unconscionable. We cannot grant this premise, and need not therefore discuss its conclu-

sion. On a complete breach the liquidated damage would, at most, amount to $30,000, a figure not, as we think, unreasonable or unconscionable in view of the purposes of the contract and the nonexistence of any measure by which the public damages can be ascertained, they being too uncertain and conjectural and of a kind the law rejects when sought to be recovered for a breach of contract.

Looking at the contemplated profits to the community from their monetary value only, the loss for the breach for two consecutive years might, so far as measurable, be a sum much larger in actual money than $10,000. It is true, it might be much less, all depending upon the extent of the failure of the company to maintain the agreed pay roll. It is urged by counsel that this must be a penalty, because, rather than lose the $10,000 during any two-year period in which the pay roll might approximate the amount agreed upon, it would be to the interest of the company to employ help it actually did not need, and thus maintain its pay roll. This argument has no force, for the reason that among the contemplated advantages of the contract to the citizens were those which might result to the community by a going concern paying to its employés during a certain period a certain sum of money to be distributed in the locality in the way wages are usually distributed. Under such circumstances, it was not important to citizens that the company employed more men than it really needed. In these considerations, the large purposes involved, through which the city would be upbuilt, and not susceptible of measurement in money from any standpoint, are given no place. The accomplishment of these purposes was also a part of the profit the inhabitants were to reap through the contract's fulfillment. This case is easily distinguished from O'Brien v. Illinois Surety Co., 203 Fed. 436, 121 C. C. A. 546 (C. C. A. 6), in which a bond for the performance of many things was held by this court to be a penalty, because it applied no matter whether the breach was trifling or substantial, while here we hold the same amount would be due whether there was no pay roll for the entire two years or whether the pay roll for two years continued but substantially smaller than the stipulated sum. The stipulated amount does not seem unconscionable or unreasonable in view of the purposes for which the contract was made.

The New York citation (Ward v. Hudson River Bldg. Co., 125 N. Y. 230, 26 N. E. 256), cited in Ross v. Loescher, 152 Mich. 386, 388, 116 N. W. 193, 125 Am. St. Rep. 418, is only of importance in its relation to the claim of the appellee that the stipulated amount is disproportionate to the loss sustained. The finding that the amount is neither unconscionable nor unreasonable would seem to dispose of that claim. But the case is referred to here only because it was discussed at length in Sun Print. & Pub. Ass'n v. Moore, 183 U. S. 642, at pages 668, 669, 22 Sup. Ct. 240, at page 251 [46 L. Ed. 366], in which then Mr. Justice White said:

"The meaning of the court is made clear by the following statement, appearing on the same page with the above excerpt: 'We may, at most, say that where they have stipulated for a payment in liquidation of damages, which are in their nature uncertain and unascertainable with exactness, and may be dependent upon extrinsic considerations and circumstances, and the amount

is not. *on the face of the contract*, out of all proportion to the probable loss. it will be treated as liquidated damages.' "

From these cross-references it may be assumed that the Supreme Court of the United States, the Supreme Court of Michigan, and the Court of Appeals of New York, agree that it is only when the stipulated amount is, upon the face of the contract, out of all proportion to the probable loss, that it will be treated as a "penalty," and not as "liquidated damages," even if designated by the parties to be the latter. The face of this contract makes no such disclosure.

[7] It is urged further that the stipulation was only collateral to the object of the contract, and hence intended to secure performance and not to compensate loss. This cannot be, because the maintenance of the agreed pay roll was, on the part of the board, the main purpose of the contract.

The Board lays the damage in $10,000 on the theory that the consideration failed. The total damage, however, was not that sum, but the loss of the advantage which would accrue by the expenditure of the $10,000. It, of course, can only recover the stipulated sum.

The trustee relies much on Davis v. Freeman, 10 Mich. 188, but we think he is not justified in doing so. There Davis and Ingersoll contracted with Freeman to draw, during the following winter, all the pine timber on a certain lot of land at $1.50 per 1,000 feet, for which they were to be paid in necessary supplies up to $1 per thousand feet, as fast as the logs were barked, inspected and scaled, Freeman to furnish enough supplies to begin the work in advance of the barking of any logs, "it being understood that the advance is to be part of the one dollar payment, and the balance, fifty cents per thousand feet, to be paid in money when this contract is completed, it being understood that the balance kept back is to secure the completion of this contract; and it is hereby agreed between the parties that the fifty cents per thousand feet is settled, fixed and liquidated damages, in case this contract is not completed by said first party." Davis and Ingersoll failed to draw all the timber. In Freeman's suit against them, one of the questions was whether 50 cents per thousand feet was to be regarded as stipulated damages or in the nature of a penalty for not completing the contract. It was held that the stipulation was, in itself, a "penalty," and was not by way of compensation, because, it is to be inferred, the damage for the nonperformance by the defendants was such loss as might be shown by proof. This pertinent remark was made in the opinion (10 Mich. 191):

"If the contract had provided for the payment of fifty cents per thousand feet as liquidated damages for the timber not drawn, the case would be altogether different."

Whatever may be said of that case, it does not in the least negative the rule so clearly stated and consistently followed in Michigan; for the contract under discussion gives no opportunity, upon its breach, for the proof of any actual damage. For its breach, the community in whose behalf it was made would, except for the stipulation, lose its contemplated fruits, and the provision for the payment of a stipulated sum has no meaning.

We hold that the stipulated sum in this contract means "liquidated damages."

[8] Is the claim provable in bankruptcy?

The contract is executory. The time for its completion would ripen long after the date of the company's bankruptcy. If the company had itself made compliance with its agreement impossible, or had repudiated its agreement, there is no doubt that the doctrine of anticipatory breach would have been applicable and the board could have elected to defer suit until the time of performance had elapsed, or could have sued at once for the breach. This doctrine was established in Roehm v. Horst, 178 U. S. 1, 20 Sup. Ct. 780, 44 L. Ed. 953, in which the English and American cases are reviewed; was declared by this court in Weber v. Grand Lodge, 169 Fed. 522, 533, 95 C. C. A. 20, in El Paso Cattle Co. v. Stafford, 176 Fed. 41, 47, 99 C. C. A. 515; was reaffirmed in The Eliza Lines, 199 U. S. 119, 129, 26 Sup. Ct. 8, 50 L. Ed. 115, 4 Ann. Cas. 406, and in Citizens' Bank v. Davisson, 229 U. S. 212, 224, 33 Sup. Ct. 625, 57 L. Ed. 1153, Ann. Cas. 1915A, 272; and is the settled law in the United States and in England.

This rule is held to apply also to cases in which, by reason of bankruptcy, disability to perform results. In the case In re Neff, 157 Fed. 57, 61, 84 C. C. A. 561, 28 L. R. A. (N. S.) 349, it was said by Mr. Justice Lurton, then a judge of this court:

"Bankruptcy is a complete disablement from performance and the equivalent of an out and out repudiation, subject only to the right of the trustee, at his election, to rehabilitate the contract by performance."

He cited In re Swift, 112 Fed. 315, 50 C. C. A. 264 (C. C. A. 1), and In re Pettingill (D. C.) 137 Fed. 143, in which Judge Putnam and Judge Lowell, respectively, expressed the same opinion. In these cases the authorities are carefully collated and considered. In the case In re Swift, there was an executory contract to deliver certain stocks at a future time on demand. No demand was made. In the case In re Pettingill, there was a contract to purchase stock at par at a time specified. In the case In re Neff, the bankrupt was one of the makers of promissory notes payable in a certain sum at a future date. In those cases, as in this, the petition in bankruptcy was filed before the time of performance, the bankruptcy proceedings were involuntary, and the adjudication was made at the date subsequent to the filing of the petition.

The trustee claims that, whatever the rights of a creditor upon an anticipatory breach might amount to otherwise, they are of no value here because, under the forms of proof prescribed by the Supreme Court of the United States in cases of bankruptcy, it is required (Form No. 31 [89 Fed. xlii, 32 C. C. A. lxvi]) that the creditor shall set forth upon oath that the person against whom the petition in bankruptcy has been filed "was at and before the filing of said petition, and still is, justly and truly indebted to" the creditor; and, since the debt did not accrue before bankruptcy, and only accrued because of bankruptcy, it cannot be proved. He cites to the point Zavelo v. Reeves, 227 U. S. 625, 33 Sup. Ct. 365, 57 L. Ed. 676, Ann. Cas. 1914D, 664, to which reference will be made.

We have found the sum stipulated to be "liquidated damages," a fixed, certain sum, the right to recover which accrued to the board upon the bankruptcy of the company. That right did not strictly exist "before" the filing of the petition, though it did exist and accrued at that time. The question is not new. It was dealt with by Judge Lurton, Judge Putnam, and Judge Lowell in the cases referred to. Judge Lurton says: [3]

"It is sufficient that a claim becomes provable as a consequence of bankruptcy. The right to sue for and recover damages then accrues."

He quotes from Judge Lowell's opinion: [4]

"For admission to proof, however, the claim need not arise before bankruptcy, nor need the contract be broken theretofore. It is sufficient for proof if the breach of contract and bankruptcy are coincident."

Judge Putnam says: [5]

"The trustee maintains that the form of proof prescribed by the Supreme Court requires that it should state that the debt proved existed 'at and before the filing' of the petition for adjudication of bankruptcy; but, in view of the statute, this must be construed, as is commonly done, to give such effect to the word 'and' that it may read either 'or' or 'and,' as circumstances may require. * * * There can be no question that it is sufficient if the debt existed at the point of time of the filing of the petition in bankruptcy."

Section 63a of the Bankruptcy Act enumerates the kinds of debts which may be proved and allowed against the bankrupt's estate:

"(1) A fixed liability, as evidenced by a judgment or an instrument in writing, absolutely owing at the time of the filing of the petition against him, whether then payable or not, * * *; (4) founded upon an open account, or upon a contract express or implied."

If, as we have found, bankruptcy is an anticipatory breach and the right to sue is coincident with the bankruptcy, it would seem that the fixed sum can be proved either under subdivision 1 or under subdivision 4. It is here that Zavelo v. Reeves becomes applicable; and it makes against the trustee. It was said by Mr. Justice Pitney (pages 630 and 631 of 227 U. S., page 367 of 33 Sup. Ct., 57 L. Ed. 676, Ann. Cas. 1914D, 664), referring to section 63:

"Of the several classes of liabilities, those in clauses 1, 2 and 3 are in terms described as existing at or before the filing of the petition."

"Clause 4," he says, "describes simply debts that are 'founded upon an open account, or upon a contract express or implied,' not in terms referring to the time of the inception of the indebtedness. But, reading the whole of section 63, and considering it in connection with the spirit and purpose of the act, we deem it plain that the debts founded upon open account or upon contract, express or implied, that are provable under section 63a—4 include only such as existed at the time of the filing of the petition in bankruptcy."

Following these statements, he says, that in the promulgation of the general orders and forms in bankruptcy, including form 31, the court in effect adopted the construction of section 63 embodied in the quotation last made. From this it would seem that 4 is broad enough to

[3] In re Neff, 157 Fed. 61, 62, 84 C. C. A. 561, 28 L. R. A. (N. S.) 349.

[4] In re Pettingill [D. C.] 137 Fed. 143, 146.

[5] In re Swift, 112 Fed. 315, 321, 50 C. C. A. 264.

let in such a claim as this, and 1 is not so narrow as to exclude it; for the claim, as we have seen, became an enforceable debt coincident with, and therefore at, the date of bankruptcy. Without deciding however, that the case comes within section 1 (Comp. St. 1913, § 9586),[6] we hold that it is clearly covered by section 4 (section 9588).

The case does not call for a consideration of the question of the provability of a claim under a lease for rent coming due after bankruptcy, discussed by Judge Warrington in Courtney v. Fidelity Trust Co., 219 Fed. 57, —— C. C. A. ——, and upon which the authorities are at variance; for there are contingencies which may, after bankruptcy, affect the stipulated amount to be paid as rent under a lease, which are not pertinent to this case, or to the others cited holding an executory contract for the payment of money to be broken by bankruptcy.

[9] But it might by urged that, since, in involuntary proceedings, the bankrupt is not necessarily dispossessed of his property or prevented from carrying on his business until the adjudication in bankruptcy, there could be no breach brought about by, and existing at the time of, the filing of the petition in bankruptcy; and that the breach could not arise until, by adjudication, the debtor was declared to be a bankrupt.

We think such a contention could not prevail. The petition in bankruptcy necessarily sets forth an act of bankruptcy which must exist before the filing of the petition. The adjudication finds the averment in that behalf to be true, and necessarily as of the time it was made. The adjudication is but declaratory of the truth of the allegations of the petition and finds that the debtor was at that time bankrupt.

It is said in Acme Harvester Co. v. Beekman Lum. Co., 222 U. S. 300, 307, 32 Sup. Ct. 96, 99, 56 L. Ed. 208, by Mr. Justice Day:

"The filing of the petition is an assertion of jurisdiction with a view to the determination of the status of the bankrupt and a settlement and distribution of his estate. The exclusive jurisdiction of the bankruptcy court is so far in rem that the estate is regarded as in custodia legis from the filing of the petition. It is true that under section 70a of the Act of 1898 (Comp. St. 1913, § 9654) the trustee of the estate, on his appointment and qualification, is vested by operation of law with the title of the bankrupt as of the date he was adjudicated a bankrupt, but there are many provisions of the law which show its purpose to hold the property of the bankrupt intact from the time of the filing of the petition, in order that it may be administered under the law if an adjudication in bankruptcy shall follow the beginning of the proceedings."

In Everett v. Judson, 228 U. S. 474, 478, 33 Sup. Ct. 568, 569, 57 L. Ed. 927, 46 L. R. A. (N. S.) 154, Mr. Justice Day says:

"While it is true that section 70a provides that the trustee, upon his appointment and qualification, becomes vested by operation of law with the title of the date of the bankrupt as of the date he was adjudged a bankrupt; there are other provisions of the statute which, we think, evidence the intention to vest in the trustee the title to such property as it was at the time of the filing of the petition."

A receiver may be appointed pending the hearing on an involuntary petition, "in case the courts shall find it absolutely necessary, for the preservation of estates, to take charge of the property of bankrupts

---

[6] See Cobb v. Overman, 109 Fed. 65, 48 C. C. A. 223 (C. C. A. 4), and cases there cited. In this case also the petition was involuntary.

after the filing of the petition and until it is dismissed or the trustee is qualified." Section 2, Bankruptcy Act (Comp. St. 1913, § 9586). No attachment in the interval between filing the petition and the adjudication may be levied upon the bankrupt's estate. Acme Harvester Co. v. Beekman Lum. Co., 222 U. S. 300, 307, 32 Sup. Ct. 96, 56 L. Ed. 208; Jones v. Springer, 226 U. S. 148, 155, 33 Sup. Ct. 64, 57 L. Ed. 161. The particular point need be pursued no further than to say that it is not the adjudication which creates the condition, the existence of which makes the Bankruptcy Act applicable. The adjudication fixes the status theretofore existing as alleged in the petition. If the court, by its adjudication, finds upon the petition and proof, or by consent, as in this case, the condition of bankruptcy existed, then bankruptcy ensues necessarily as of the date of the filing of the petition. As said before, the Neff Case, the Pettingill Case, and the Swift Case were also instituted by involuntary petition. It so appears in the reports of the decisions in the two cases last named and is shown by the record in the Neff Case. This question was referred to only in the Swift Case. It was there said by Judge Putnam (page 321 of 112 Fed., 50 C. C. A. 264):

"The contract ripened simultaneously with the beginning of the proceedings in bankruptcy, as the consequence thereof in connection with the adjudication which followed. Of course, as everything related back to the filing of the petition, the ripening of the claim did not occur before it was filed, nor afterwards, but simultaneously with it, as already said. Consequently, by necessary effect, there was created and existed, when the proceedings commenced, a provable claim."

We think the rule of anticipatory breach is applicable to the facts in this case, and that it requires the conclusion that the company's agreement was broken at the time the petition in bankruptcy was filed.

From all of these considerations, it follows that the claim of the Board of Commerce was provable, and was proved, in the liquidated sum of $10,000, and should be allowed.

The judgment below must therefore be reversed, with costs against the appellee, and the cause remanded for proceedings necessary to the allowance of the claim.