In re VELER.

In re HUFFMAN TRACTION ENGINE CO.

(Circuit Court of Appeals, Sixth Circuit. March 5, 1918.)

No. 2996.

1. BANKRUPTCY ⚷➞76(1)—PETITIONING "CREDITOR."

In view of Bankruptcy Act July 1, 1898, c. 541, § 1, par. 9, 30 Stat. 544 (Comp. St. 1916, § 9585), declaring that the word "creditor" shall include any one who owns a demand or claim provable in bankruptcy, and may include his authorized agent, attorney, or proxy, one holding a note of an alleged bankrupt, either as agent or trustee for the true owner, is, particularly where the debt was admitted by the bankrupt, and there was no question of set-off against the true owner, competent to join as a petitioning creditor, and the jurisdiction of the bankruptcy court, based on a petition in which he joined, is not open to attack on the ground that such petitioner was not the real party in interest.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Creditor.]

2. COURTS ⚷➞340—BANKRUPTCY—PRACTICE—CONFORMITY ACT.

The Conformity Act (U. S. Comp. St. 1916, § 1537) does not make the state rules of procedure applicable to the bankruptcy courts, the practice and procedure of those courts being prescribed by the Bankruptcy Act and the general orders and regulations pursuant thereto; hence one who was a creditor within the definition of the Bankruptcy Act may join in an involuntary petition, though he be not the real party in interest according to the local state practice.

3. BANKRUPTCY ⚷➞100(1)—ADJUDICATION—ATTACK.

Where an involuntary petition averred that the alleged bankrupt had admitted in writing its inability to pay its debts and its willingness to be adjudged a bankrupt, and the alleged bankrupt consented to the adjudication, filing an answer admitting the allegations of the petition, the adjudication is not open to attack on the ground that the written admission of inability to pay debts had not been made at the time the petition was filed.

4. RECEIVERS ⚷➞58—SETTING ASIDE APPOINTMENT.

Though under the circumstances the appointment of a receiver to carry on the business of a bankrupt corporation formed to manufacture tractors appeared to have been justified, as necessary for the preservation of the property and for the best interests of the estate, the trial court is entitled to know all the facts in the case, and where the appointment was induced by misrepresentations, the receivership may be set aside.

5. BANKRUPTCY ⚷➞474—RECEIVERS—APPOINTMENT—COSTS.

While those creditors procuring the appointment of a receiver must pay his compensation and expenses, where the receiver never acquired possession of the estate, or there was no fund in court excepting that which was the property of those who had successfully resisted the appointment, yet in view of Bankruptcy Act, § 3e (Comp. St. 1916, § 9587), requiring a bond on the appointment of a receiver prior to adjudication, the petitioning creditors cannot, where the receiver took possession of the entire estate of the bankrupt, without objection by the bankrupt or any creditor or lien holder, be held liable for the costs and expenses of the receivership, although, if it was wrongfully procured, the trustee has the right to recover from them for injuries to the estate resulting from such receivership.

⚷➞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

6. BANKRUPTCY ☞145(1)—TRUSTEES—RIGHTS OF ACTION.
The right to recover for the injuries to the estate of a bankrupt resulting from the wrongful appointment of a receiver vests in the trustee when he is appointed.

7. BANKRUPTCY ☞474—EXPENSES OF RECEIVERSHIP.
In view of Bankruptcy Act, § 64 (Comp. St. 1916, § 9648), giving priority to those expenses which are necessary for the preservation of the estate, when a receivership ends and the assets are turned over to the trustee, the expenses of the receivership, which include the lawful debts of the receiver, are a charge on the assets, for no receiver can be appointed, excepting as a step in what is necessary for the preservation of the property.

8. BANKRUPTCY ☞345—SECURED CLAIMS—PRIORITY—RECEIVER'S CERTIFICATES.
Where a secured creditor accepted a receiver's certificate as a partial payment on its debt, it cannot, having accepted the certificate, assert that its lien was prior to that of the receiver's certificate.

9. BANKRUPTCY ☞347—RECEIVER'S CERTIFICATES—LIENS.
Where it was to the interest of secured creditors, who held liens on the property of the bankrupt, that its manufacturing plant should be put into successful operation, and they acquiesced in the appointment of a receiver to carry on the business, and in the sale of the property by the trustee free from their liens, the receiver's certificates, lawfully issued, are entitled to priority in payment out of the proceeds of the property over the liens of the secured creditors.

10. BANKRUPTCY ☞474—RECEIVER'S DEBTS.
Where a receiver, appointed to carry on the business of a bankrupt and authorized to issue certain receiver's certificates, incurred other debts without authority, the fund derived from the sale of the bankrupt's property is not liable for such unauthorized debts, and the only recourse of such creditors is against the receiver personally, and perhaps against his bond.

11. RECEIVERS ☞58—VACATING APPOINTMENT—IMPOSITION ON COURT.
Where the District Judge, after adjudicating a corporation a bankrupt and appointing a receiver, became suspicious that he had been imposed upon, two courses were open to him, to direct some procedure for the framing of issues by which the parties charged with misconduct might know the charge and have an opportunity to try the fact, or to satisfy himself by a summary inquiry as to whether such proceeding should be instituted, so a summary determination that the court had been imposed upon, without framing any issues, was improper.

12. BANKRUPTCY ☞287(3)—JURY ☞31(4)—AUTHORITY OF COURT.
A complaint or petition by a trustee, addressed to the bankruptcy court in the exercise of its equity powers, praying an accounting for damages resulting from the appointment of a receiver, which was secured through imposition on the court, is not beyond the equitable jurisdiction of a court of bankruptcy, or objectionable as violative of the right to a jury trial.

13. EVIDENCE ☞383(3)—CERTIFICATE OF TRIAL COURT—EFFECT.
In view of the imperfections of the human memory, a statement or certificate of the District Judge with respect to the appointment of a receiver, which it was asserted was secured through imposition on the court, does not, where made in a summary proceeding in which no issues to determine the liability of the petitioning creditors were framed, import verity, as would a record of judicial proceedings required to be certified by the court.

14. BANKRUPTCY ☞440—APPEAL OR REVISION.
The question of the liability of petitioning creditors for the costs of a receivership had in a bankruptcy proceeding is a controversy arising in

bankruptcy between such creditors and the adverse interests; so an appeal, and not petition for revision. is the proper remedy to review an order relating thereto.

**15. BANKRUPTCY ⟪⟫444—PROCEEDINGS—PETITION TO REVISE.**

Where questions as to the distribution of a fund derived from a sale of all of the bankrupt's property free from liens are involved, petitions to revise orders made therein disclose jurisdiction.

Appeal from and Petition for Revision of Proceedings of the District Court of the United States for the Western Division of the Northern District of Ohio; John M. Killits, Judge.

In the matter of the bankruptcy of the Huffman Traction Engine Company. Edward Veler appeals from, and files sundry petitions to revise, orders of the District Court. Orders set aside and vacated, and cause remanded.

The Huffman Traction Engine Company was an Ohio corporation, located at Kenton, organized and managed by Mr. Huffman, and its purpose was to manufacture and sell farm tractors containing a certain invention by him. It raised a scanty capital by selling stock. It made a contract with the Kenton Commercial Club whereby the Traction Company was to erect on the Commercial Club's land a $15,000 building, of which price the Commercial Club would contribute $3,000, and after the company had operated the factory to a specified extent for five years, the Commercial Club was to convey the land, which had been worth $1,200. The building was erected, the $3,000 paid, and the deed delivered in escrow. The development of the tractor into commercial form was delayed, the working capital was exhausted, and debts accumulated. Upon much of the factory equipment only partial payments were made, and liens were reserved by the vendors. Huffman had raised money upon his notes in several different banks, and had loaned these sums and others to the company on open account. It had come about that Huffman's attorney, Mr. B. F. James (who, apparently, then had no pecuniary interest in the company or its success) had recommended Huffman for credit at banks where James was known and had thought proper to indorse Huffman's paper. Thus it resulted that, on November 20, 1912, the company owed Huffman $3,397; and on that day it executed to him its six promissory notes for $500 each, and one for $397, each due in three months. He indorsed these over to James, in part to be used by James to take up outstanding Huffman paper and (perhaps) in part for what he owed James. It is claimed that it was then expected to carry the business along successfully, but that the insistence of certain lien creditors upon immediate payment upset the plan.

However that may be, a petition in bankruptcy was filed in the court below on November 27th; the three petitioning creditors being the Bowling Green Bank, the Tontogany Bank, and Edward Veler. Each alleged that it was a creditor holding one of these November 20th notes. The petition alleged a transfer with intent to prefer and with intent to defraud, and also alleged that the company had admitted in writing its inability, etc. The fact was that James had indorsed and transferred one of these notes to the Tontogany Bank in exchange for its formerly held Huffman note, had discounted one, for credit to himself or Huffman, at the Bowling Green Bank, and had turned over the third one, without consideration, to Veler, his office clerk, to be handled for James and as he might direct. James doubtless did this, instead of using his own name, because he was an attorney, and expected to be the attorney in the case, and preferred not to be a party on the record. The petition was verified by James, as attorney for the Bowling Green Bank, by Mr. E. D. Bloom, as attorney for the Tontogany Bank, and by Veler himself. On the same day, an oral application was made to the District Judge for the appointment of a receiver. James and Bloom and Huffman joined in appearing before the judge, and in stating the pecuniary

condition of the alleged bankrupt and its reasonable expectations of being greatly benefited, if it could raise money enough to continue its business to the point of completing ready for sale the four tractors that were then in process of construction. Thereupon an order was made reciting that the three petitioning creditors had asked for the appointment of a receiver, that it appeared such appointment was "absolutely necessary for the protection of the estate," and that it would be "for the best interests of all creditors, and other persons interested," and directing that Mr. Bloom be appointed receiver, "clothed with all the power and authority of receivers in bankruptcy in like cases"; that he file a $1,000 bond as receiver; "that he continue to conduct the business of said alleged bankrupt until the further order of this court." At the same time, a bond was filed in the sum of $1,000, signed by the banks, per their attorneys, and by Veler, as principals, and by a surety company, conditioned to indemnify the alleged bankrupt for such damages as it should sustain in the event that the seizure by the receiver should prove to have been wrongfully obtained. On the same day, Bloom filed his bond as receiver, with a penalty of $1,000, with a surety company as surety, with the usual conditions, summarized as the faithful performance of all his official duties as such receiver. .

On December 2d, the receiver filed his petition, setting up the reasons therefor, and asking an order for $5,000 receiver's certificates. Thereupon an order was made, authorizing ten certificates, of $500 each, which should be "a charge upon the income of the receivership and upon the body of the property prior to all other liens existing upon said property, except taxes upon the property and the costs of this proceeding"; but the order directed that only two of such certificates should be negotiated without further order. Further orders were later made, so that, eventually, four such certificates were issued, aggregating $2,000; and of these one was delivered to a machinery lienholder as a payment upon the lien and to postpone seizure, and three were sold to banks for cash. The business of finishing the tractors, etc., continued in various ways some two months. In June there was an order of adjudication, followed by election of a trustee.

The receivership was disastrous. The three or four machines, which were partly or wholly finished, realized but very little. The receiver obtained practically no money from any source, save from the sale of the certificates, and about $500, payment on one tractor, and, after paying operating disbursements and about $200 fees for himself and his attorney, Mr. James, had on hand for the trustee $8.84. In addition, several hundred dollars of debts, incurred by the receiver for materials and labor, remained unpaid. After a further interval the trustee sold, free from liens, all the property, including the real estate and all the remaining machinery covered by the mortgages or liens. The total of these prior liens upon the property, including the $4,200 claim of the Commercial Club, was $7,600. The total realized from the sale was $4,790, of which only $430 came from unincumbered property. The lienholders and the certificate holders and the receiver's other creditors all claimed priority upon most of this fund. The referee made certain awards and ordered distribution. Upon review, this order was confirmed by the District Court. Before it was executed, and upon the special application of an interested party, the District Court sent it back to the referee, as master, and his later report duly came up on petitions to review or exceptions. Thereupon the District Judge, on his own motion, instituted an open court inquiry, summoned witnesses, and made what seemed to him the necessary thorough inquiry into all the history of the transaction. He reached and announced the conclusions that there had been no jurisdiction, because there were not three real petitioning creditors, Veler having no actual interest, and that the District Judge had been grossly misled into the appointment of a receiver, the issue of the certificates, and such approval as he had given to the transaction. He also found that the original petitioning creditors were liable for the receiver's certificates and the receiver's debts and all later costs. An order was then made directing that the petitioning creditors pay to the trustee these sums of money, or else upon a day fixed show cause why they had not done so. Later, upon the hearing of such order, it was made final,

and various matters of distribution were determined, and another order, still later, made complete final distribution. An appeal and three different petitions to revise bring all the chief aspects of the matter to this court.

Clyde R. Painter, of Bowling Green, Ohio, Marshall & Fraser and Denman & Wilson, all of Toledo, Ohio, and Edward Beverstock, of Bowling Green, Ohio, for appellants.

Taber & Daniells and Doyle, Lewis, Lewis & Emery, all of Toledo, Ohio, and C. M. Cessna and C. W. Faulkner, both of Kenton, Ohio, for respondents.

Before KNAPPEN and DENISON, Circuit Judges, and McCALL, District Judge.

DENISON, Circuit Judge (after stating the facts as above). [1, 2] 1. The fact that Veler, one of the petitioning creditors, held the legal title to his note merely as agent or trustee for James, is not important, in any aspect now involved. The note represented a valid debt from the company to Huffman; Huffman had indorsed and transferred it to James; whether James held it under any trust for Huffman, or with only a personal interest, is not material, because he had the full legal title; James delivered the note, indorsed in blank, to Veler, directing him to take proceedings thereon in his own name, and the legal title thereby passed. Whether Veler held this as agent and trustee for James, or for Huffman, was a matter of no concern to any one except James and Huffman. So far as appears, the company had no offset or other claim against Huffman or James which would make it important that the claim should be presented in the name of either, and the company has never made any objection to Veler's action; nor has James nor Huffman. Under these conditions, we think it clear that Veler must be considered a competent and qualified petitioning creditor, and that no fraud or misleading of the court, affecting its original jurisdiction in the bankruptcy matter, can be predicated upon the fact that Veler was acting for some one else.

Indeed, it seems that Veler's action in this respect would not have been criticised, save for the Ohio statute (Gen. Code, § 11241), which provides that an action must be prosecuted in the name of the real party in interest, and an opinion of the Supreme Court of that state (Brown v. Ginn, 66 Ohio St. 316, 64 N. E. 123), which holds that the defendant, in an action brought upon an assigned claim by one who holds it only for collection, may defeat the action on that ground. Even if this were a subject upon which the federal courts were bound to follow the Ohio decisions, we would observe that in Coal Co. v. Bank, 74 Ohio St. 463, 78 N. E. 1128, it was held that the holder of such claim has, prima facie, the right to bring suit thereon and may maintain an action until his lack of interest is shown. It would follow that, while such right remained unchallenged by any party entitled to dispute it, the jurisdiction of the court in such action could not be affected.

With the same condition, we would further observe that the Uniform Negotiable Instruments Law, adopted in Ohio to be in effect

January 1, 1903 (95 Ohio Laws, 162), after the Ohio decision first cited, expressly provides that the holder of a negotiable instrument may sue thereon in his own name, and defines "holder" so as to include Veler (Ohio Gen. Code, §§ 8156, 8295, 8139). This is inconsistent with the rule of Brown v. Ginn, if that case extended to negotiable paper, as it seemingly does not. See 66 Ohio St. 324, 64 N. E. 123.

However, the Conformity Act (U. S. Comp. St. 1916, § 1537), does not make the state rules of procedure apply to bankruptcy courts. The practice and procedure of those courts are prescribed exclusively by the Bankruptcy Act and the general orders and regulations pursuant thereto. We think the bankruptcy court should follow the rule most generally prevailing, and to the contrary of that stated in Brown v. Ginn (see In re Kenney [D. C.] 136 Fed. 451, 455, and cases cited in R. C. L. tit. Bills and Notes, §§ 190, 198, 199); and the express language of the Bankruptcy Act gives support to this view. Those who file a petition must be creditors, and the definition of "creditor," given in paragraph 9 of section 1, includes the duly authorized agent or attorney of the one who "owns" the claim, even if "owner" necessarily means "equitable owner." This provision has no force, unless it means that the agent or attorney—at least, when holding such a claim as this—may proceed in his own name as creditor. He is answerable to his principal, and obviously his principal may raise the question whether "duly authorized"; probably the debtor may; but, until and unless some such meritorious question is raised, the right of the agent, who is the legal holder of negotiable paper, to proceed in his own name, and the power and duty of the court to recognize this right of the agent, must be clear. We draw this conclusion from the cumulative effect of all the considerations we have stated.

A case might arise where a single creditor had caused his claim to be divided into several notes, with the intention of scattering them for the purpose of creating two or more creditors, so as to give bankruptcy jurisdiction; but that is not this case. Huffman's good faith in taking the series of notes and distributing them in the course of paying his own several debts is not questioned.

[3] 2. It is said that the only transfer to prefer or defraud creditors which had been made by the company was one for the benefit of these notes, and hence it was a fraud to rest jurisdiction upon such an allegation. However that might be, the petition also alleged another sufficient act of bankruptcy, viz. that the company had admitted in writing its inability to pay its debts and its willingness to be adjudged a bankrupt. Whether such written admission had been at that time actually executed does not appear by this record;[1] but, if it had not been, its absence was merely an oversight. The company was doing anything which these creditors desired done; and we can find nothing here to defeat the jurisdiction of the court. Indeed, in due course, by its written answer, the company did consent to the adjudication.

---

[1] Except by the answer, which admits all the allegations of the petition.

[4] 3. It is most unfortunate that there was no written application for the appointment of a receiver, nor any record of the representations then made to the court. There are definite statements to be found in the petition for the allowance of receiver's certificates, and this, doubtless, reflects the substance of the original application. Since the judgment against the petitioning creditors rests upon the theory that their counsel misled the court into the appointment of a receiver and the carrying on of the business and issuing the certificates, it becomes important to examine the stated elements of that misleading.

(a) It is suggested that the representations substantially were to the effect that the assets of the company largely exceeded its liabilities, that the embarrassment was temporary, and that, with the aid of a short receivership, the company would be able to satisfy its creditors and demonstrate its solvency. It is quite evident that no later remedial proceedings can rest upon the supposition that the bankruptcy court accepted such a claim and appointed a receiver on such a theory, presented by the same creditors who were the petitioners for bankruptcy adjudication. To do so would be deliberately to apply bankruptcy remedies in a case where, in truth, the most essential element of bankruptcy was conceded to be absent.

(b) Either directly or because of indorsements, James was then, in substance, among the largest of the unsecured creditors—perhaps the chief one. The bankruptcy proceeding and the receivership were planned by him in part because he thought them the best remedy for his own protection. If, appearing as counsel for petitioning creditors and in effect for the company, he advised the court that a receivership was necessary, he ought to have disclosed his personal interest. Complete good faith with the court required this degree of frankness. The court might not give the same force to the advice from counsel who was a creditor as from counsel who was disinterested. At the same time, it is not easy to see the great materiality of this lack of frankness as applied to obtaining the receivership and the order continuing the business; its prejudicial effect at later stages is much more probable. James was not a preferred creditor (except by lien on the patents, which were worthless); his personal interests and those of general creditors and those of the Huffman Company were, prob ably, really identical. There seems scant room for supposing that he made any statements or gave any advice which would not have been made or given if he had not been a creditor; however, we do not doubt that the presence of this undisclosed personal interest is one of the circumstances to be considered upon the main issue here involved.

(c) It was not disclosed by the petition for certificates, and it is said not to have been disclosed at all, that the Commercial Club had either a claim of $4,200 or title to the real estate, and that various machinery and equipment vendors held purchase-price liens well towards (as it turned out, beyond) the full value. The claim of the Commercial Club for $4,200 had been entered on the books of the

Huffman Company and has been proved and allowed, so that it is now too late for it to be questioned; but we do not understand upon what theory any such claim existed. The contract made no provision for the repayment of the $4,200 in any event, and since the contract neither preserved any lien for the $4,200 to secure the performance of the five-year maintenance contract nor provided liquidated damages for a breach (see Board of Commerce v. Security Co. [C. C. A. 6] 225 Fed. 454, 140 C. C. A. 486), counsel might well have believed that no such claim existed, and might later have been glad to accept the Commercial Club's theory of lien. However, the right of the Commercial Club to forfeit the title, if the business did not continue as agreed, was clear, and the right of the machinery and equipment vendors to take back their property was of the same character. It is obvious that the existence of these rights and the imminent danger of their exercise constituted persuasive reasons for receivership—the best reasons there were. While this consideration bears on the question whether the applicants for the receivership intended fraudulently to mislead the court into the appointment, by keeping back facts which constituted good reasons, and putting forward falsehoods constituting less sufficient grounds, yet the court was, of course, entitled to full disclosure of the truth, so far as known; and if the amount of the liabilities was fraudulently understated, or the assets similarly overstated, in material extent, for the purpose of inducing an appointment which it was feared would be denied if the truth were told, it is clear that a wrong was done.

(d) Representations as to the nearly finished condition of the tractors and the certainty of a profitable market will, of course, support the theory of fraud only if they pertained to known facts or to opinions given so recklessly as to be equivalent to fraudulent statements of fact. This specific feature was not much considered below, and it will require further attention, and we now pass it by without other comment.

Upon review of the whole record, there must be grave doubt whether there was anything improvident in the conclusion to appoint a receiver, or whether the appointment would not have been made just the same if the full and exact facts then existing had been stated to the court. The vital trouble with the situation, as it turned out, was not that the debts were larger than supposed, or that there were so many vendor's liens, but was rather that the tractor, upon which the whole enterprise was based, proved to be a failure; and it seems entirely probable that in December, 1912, Huffman and James, and everybody concerned, believed that the tractor, when finished, would work and would sell. The situation, in December, 1912, as we now know it, was that $10,000 or $15,000 in cash, and an equal amount in debts, had been invested in the enterprise, and that, if it stopped at that stage, the plant and the machinery were of minimum value, and the materials and unfinished machines on hand were mostly junk; while, if the business could be continued long enough to demonstrate that it could be profitable, all the assets would greatly increase in salable

value. In that situation, the investment of $2,000 in continuing the business up to the point of demonstration one way or the other, and under the belief that it would succeed, would seem the prudent thing to do, and to be fairly within the definition of what was "absolutely necessary for the preservation of the property" (section 2 [3]), and "necessary in the best interests of the estate" (section 2 [5], Comp. St. 1916, § 9586). Nevertheless the court might not have taken that view, and was entitled to know the truth.

What has been said applies to three of the receiver's certificates, which were issued as the direct and normal consequence of the creation of the receivership. The fourth certificate (issued as 3) requires separate consideration. Its issue is claimed to have been secured by an express false representation that an attorney for one creditor consented. The record suggests the possibility of confusion and mistake on this subject rather than the supposed express intent to deceive, because this attorney for one creditor obviously had no power to consent generally to the issue of this certificate, and the false representation that he had consented would have been so far futile that it would hardly have been worth deliberate making; yet, in view of the proceedings which we later approve, we do not attempt to foreclose this question. If this certificate was fraudulently procured, and if thereby the burden upon the estate was increased $500 beyond what it otherwise would have been, damages to that amount must follow.

[5, 6] In cases where the receiver had never come into possession of the estate, or where there was no fund in court, excepting that which was the property of those who had always and successfully resisted the appointment of a receiver, it has been held that those who procure his appointment must pay his compensation and expenses. These cases were discussed in our opinion in Re National Carbon Co., 241 Fed. 330, 333, 154 C. C. A. 210. They apparently rest upon the rule of necessity. Since there is no estate or fund which can rightly be charged, and since the expenses must be paid by some one, those causing the receivership must respond. The present case is one where the entire estate of the bankrupt came into the hands of the receiver, remained there until it was turned over to the trustee, and is now in court for final distribution. The bankrupt practically consented to the appointment; no creditor or lienholder ever objected. The court authorized the incurring of the debts by the receiver, to become a charge upon the property, and credit was given on the faith of this authority. When, in such a situation, it develops that the order appointing a receiver should be and is vacated, or otherwise appears that the order was improvident, we find no principle upon which the creditors petitioning for receivership can be held directly liable for the debts which the receiver incurs. Those who became creditors of the receiver did not know the petitioning creditors and did not give credit to them; the receiver has acted as an officer of the court; and we cannot satisfactorily work out any theory of liability by an undisclosed principal. We think the true rule in such cases must be that, where the appointment of a receiver was procured wrongfully and

an injury results to the estate, the later appointed trustee is entitled to have, for the benefit of the estate, the damages consequent on such injury. This is the theory of the bond which the statute requires petitioning creditors to give (Bankruptcy Act, § 3e); it is the alleged bankrupt which must be indemnified for damages "in the event such seizure shall prove to have been wrongfully obtained"; and we have held that the right to recover for injuries to the estate pending the receivership vests in the trustee when he is appointed (Arnold v. Horrigan, 238 Fed. 39, 44, 151 C. C. A. 115). Obviously, this damage may or may not be the same in amount as the valid debts of the receivership.

[7] Ordinarily, when the receivership ends and the assets are turned over to the trustee, the current expenses of the receiver have been paid out of the current receipts and any lawful indebtedness may be deducted from the assets which go to the trustee. There can be no doubt that such debts are a charge on those assets at that time, and if they are not paid, the assets clearly remain subject to that charge. Not only does this charge result from the nature of the case, but it is expressly recognized by the distribution section (section 64) which gives priority to those expenses which were necessary for the preservation of the property; and the expenses of the receivership fall under this class by the very language which is used with reference to the creation of the receivership. No receiver can be appointed excepting as a step in what is absolutely necessary for the preservation of the property. It follows that, in this case, the lawful debts of the receiver must be paid out of the assets in the hands of the trustee, excepting so far as claims with priority may prevail.

[8, 9] It is not claimed that the action of the court, in 1916, in vacating the order for a receiver made in 1912, would affect the validity of the receiver's certificates issued and sold pursuant to the express order of the court while the receivership was in operation. The only question considered below or to be decided here is: From what persons or fund shall payment be exacted? Neither are we concerned with the inquiry whether a bankruptcy court may lack the usual power of courts of equity to authorize receiver's certificates or whether such certificates may lawfully be given priority over existing liens without the consent of existing lienors. The certificates represent valid debts of the receiver, and, holding as we do that such valid debts are part of the expenses of administering the estate or preserving the property, the priority attempted to be given by the form of the order and of the certificates is of practical importance only as evidence as to whether prior lienholders consented to be subordinated. We conclude that any degree of consent which is necessary to accomplish such subordination sufficiently appears. The two largest secured creditors are the Supply Company and the Commercial Club. The Supply Company accepted one of these certificates as a partial payment on its debts, and thereby had full notice of and the benefit of the provision that the certificates should be prior to all existing liens. Obviously it cannot take such certificate and then claim that its own lien is alone

not affected by this provision.[2] The Commercial Club was to be directly benefited by the operation of the plant, for successful operation alone could accomplish the underlying purpose of the Commercial Club's interest. So, also, each of the other secured creditors was to be benefited by such operation. One creditor held a reservation of title to a generator and switchboard installed in the plant. It was, of course, worth less if dismantled and taken out, and any attempt to make the plant a going concern was intended to be for the benefit of this creditor. The three other creditors, whose liens were allowed, held mortgage or other liens upon the tractors in process of construction, and the money represented by the receiver's certificates, put in the form of materials and labor, was very largely added to these tractors, so that there was direct benefit to these creditors. All the time it must be remembered that the amount of unincumbered property was negligible, and that unsecured creditors had no interest in the property covered by liens, since, both separately and collectively, the property covered by mortgage or liens was insufficient to pay the secured debts. The secured creditors were therefore the ones primarily interested in preserving the property through the operation by receiver. It seems probable that they would have known of the priority given to the certificates upon their issue; but, however that may be, we find that each of these secured creditors (except the Supply Company) acquiesced in the operation by the receiver, made no effort to enforce his lien by withdrawal of his property or otherwise, acquiesced in the sale of the entire property by the trustee free from liens, and in no form or manner attempted to make any reservation or preservation of his lien as superior to the expenses of operation or the other expenses of administration. Under these conditions, we think it clear that the receiver's debts represented by the certificates are entitled to priority in the fund derived from the property covered by liens; and though the pro rata contribution, as directed by the referee, is not wholly satisfactory, no other practicable method appears.

It appears that there is a small fund ($430) coming from the sale of unincumbered property. The considerations which give the receiver's certificates priority in the proceeds of the property covered by liens do not apply, or apply with less force, to the ordinary administration expenses after the trustee was appointed. As to these, it may well be that they were incurred only in the expectation that they would be paid out of the general fund and should be confined thereto. This we do not undertake to consider.

[10] The receiver's debts, other than evidenced by the certificates,

2 We do not overlook the fact that the Supply Company took this certificate "without prejudice to all the rights and liens which [it] holds under its said chattel mortgage." This proviso cannot reasonably operate to permit the Supply Company to attack the declared basis of the series of certificates, one of which it was accepting; the proviso is given due effect by treating it as intended to meet any claim that acceptance of partial payment or extension of time would be a waiver of the existing chattel mortgage rights or the initiated foreclosure rights. The Supply Company's liens upon machinery and proceeds continued unimpaired, save by the practical concession that the receiver's certificates were rightly part of the expenses of administration.

and except for labor, stand upon a different footing. In Haines, Receiver, v. Buckeye Wheel Co., 224 Fed. 289, 139 C. C. A. 525, where, also, the court had authorized the business to be continued by the receiver, and where the intention of the court not to permit the receiver to incur any obligation except the certificates, was, if anything, less clear than in the present case, this court held that the receiver's other debts were unauthorized. That was not a bankruptcy receivership, but there seems to be no difference in principle. It necessarily follows, from the Haines Case and from the general rule that the fund is not liable for receiver's debts incurred without authority, that the only recourse of these other creditors is against the receiver personally, and perhaps (a question not decided in that case) against his bond. The labor debts, however, were given priority over the lienholding creditors by the first referee's report and it is not clear that any objection was ever made. If not, their right thereto must be taken as conceded, and is not to be disturbed.

[11, 12] It remains to decide whether the issues, whether there had been a wrongful procurement of the receivership and whether the petitioning creditors were liable therefor, were rightly tried. We cannot escape the conclusion that there has been a mistrial thereon, and this conclusion necessarily requires a determination of what the right method may be. The District Judge became suspicious that he had been imposed upon. It was not only his clear right, but his duty, to proceed upon his own motion into a thorough inquiry upon the subject. In such a situation, we think two courses open to the trial judge: The first is to direct some procedure for the framing of issues, by which the parties charged with misconduct or liability may know the charge and have suitable opportunity to try the fact. The second is to proceed with a summary, more or less ex parte, inquiry, in order to satisfy himself whether a proceeding of the first class should be instituted. We think the court below failed to preserve the necessary vital distinction between these two methods. An ex parte inquiry, undertaken upon the motion of the court and pursued, without the formulation or service of any charges or issues, resulted in a formal finding of facts to the effect that the misconduct had occurred and had been committed by the authorized agents of the petitioning creditors. Thereupon these creditors (under the construction of the order most favorable to them) were ordered to show cause why judgment should not be rendered against them accordingly; but it is evident that the court had reached conclusions which, to say the least, would not be readily changed, and which seem to have been practically regarded as unassailable, unless by new and additional evidence. We cannot think that the parties charged had that kind and degree of hearing to which they were entitled.

It is said that the only alternative to the practice here pursued is a plenary action at law before a jury. This does not follow. The whole matter is ancillary to the bankruptcy proceedings, and the bankruptcy court has, in a broad sense, the power of a court of equity. A complaint or petition by the trustee, addressed to the bankruptcy court in the exercise of its equity powers, asking an accounting for the damages caused to the estate by the wrongful acts committed after

the filing of the petition and asking for judgment against those responsible therefor, would not, in a case like this, go beyond the jurisdiction of the court of bankruptcy, according to the familiar principles of ancillary proceedings in equity; nor would it violate anybody's right to a jury trial, and it would enable the issues to be decided by the court personally familiar with the whole situation—unless, indeed, his personal knowledge and participation in the matter involved might appear to the judge sufficiently embarrassing to justify him in asking that another judge take charge.[3]

[13] How much, if any, question there may be as to what actually occurred on the presentation to the District Judge of the oral application for a receiver, does not appear. The District Judge made a statement of such matters, and neither James nor Huffman nor Bloom put in any testimony, although an opportunity was given them to do so. However, this opportunity was in the course of what they then must have supposed to be an inquiry merely preliminary to some proceeding in which they or the petitioning creditors could be fully heard, and they were under no obligation to accept the offer to give testimony in this preliminary inquiry. It is argued that this statement or certificate by the District Judge may not be disputed. This proposition cannot be accepted in its full sense. Such a statement is entitled to the highest respect and credence; under all ordinary circumstances, it would be accepted without question; but we cannot think that it imports verity in the sense in which that is true of some judicial proceedings and records. To preserve a record of what occurs before him in chambers, and to certify the same to a reviewing court are not among the duties imperatively imposed upon a trial judge; and the imperfections of human memory are too great to permit the theory of importing verity to apply to all such proceedings under all circumstances.

[14, 15] It is evident that we regard the liability of the petitioning creditors in this case as presenting a controversy arising in bankruptcy between them and the adverse interests rather than a step in the administration of the estate, and that, therefore, an appeal is the proper remedy. See In re Martin (C. C. A. 6) 201 Fed. 31, 36, 119 C. C. A. 363. This is not to say that there might not be cases in which a petition to revise would properly present an analogous question, but only that, in this case, the issue is so far outside the ordinary administration of the estate and so far between adversary parties in interest as to constitute a real controversy. However, questions as to the distribution of the fund are necessarily involved as collateral to the other issue, and each of the petitions to revise discloses jurisdiction. All motions to dismiss are therefore denied.

It would have been possible to dispose of this matter by deciding only that the necessary procedure had not been followed; but both the record and the argument have been very full in all directions, and the results which we reach as to the certificates and the unauthorized

[3] It should be stated that the District Judge who appointed the receiver did refer the present issues to another judge, and later assumed the decision himself reluctantly and because the reference had to be abandoned.

debts affect the basis of the proceedings below, and for these reasons,, and to aid in bringing an end to this complicated controversy, we have gone further in indicating our views of some collateral matters than we usually do, and we think it better to set aside wholly the orders in question, rather than to reverse only parts. This will leave the court below at liberty to repeat any action which we have not disapproved, or to modify it as the changed basis may require.

Our direction, therefore, is that the orders made by the District Court on November 2 and November 11, 1916, and January 17 and June 25, 1917, be set aside and vacated, and that the case be remanded for further proceedings in accordance with the views herein expressed. This will leave matters standing upon the second report of the master and the exceptions, objections, and motions made thereto. This disposition of the matter implies no liability to refund to any appellant any amount that it may have paid pursuant to the order appealed from; neither is it intended to disapprove the action of the court below in refusing any compensation to James or Bloom as counsel or receiver. That action was, upon this record, within the court's discretion. This is also without prejudice to such proceeding as may be thought necessary to protect the estate from loss which might result if the certificates held by the Bowling Green Bank were paid while the liability of that bank as petitioning creditor was alleged and undecided.

The costs of this court, including one docket fee for the appeal and all petitions and the cost of printing the appeal record, except pages 189 to 282, and the petition records filed January 26th, March 14th, and October 2d, will be paid by the trustee from the fund, first, out of any balance there may be of the $430 not exhausted by previous costs; and, second, at the expense of the secured creditors pro rata.